ID# 2024-0071786-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

24103933

D. Victor Reynolds - 69
MAY 24, 2024 04:50 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | |
| | ) | |
| SURGENEX, LLC, MARK DIAZ, AND | ) | |
| STEPHEN BLOCKER. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **COMPLAINT**

Plaintiff MiMedx Group, Inc. ("MiMedx"), by and through its undersigned attorneys, hereby seeks damages and injunctive relief against Defendants Surgenex, LLC ("Surgenex"), Mark Diaz ("Diaz"), and Stephen Blocker ("Blocker" and, collectively with Surgenex and Diaz, the "Defendants"), showing the Court as follows:

## **NATURE OF THE ACTION**

1. This is an employee raiding action for damages, permanent injunctive relief, and attorneys' fees premised on MiMedx's claims for breaches of its protective covenant agreements, tortious interference with its business relations and contractual relations, trade secret misappropriation, and civil conspiracy.

2. Surgenex, a direct competitor of MiMedx in the advance wound care industry that markets similar healthcare products, has waged a months-long improper and unlawful scheme to raid dozens of MiMedx sales professionals and other employees for the purpose of unfairly competing with MiMedx and destroying MiMedx's business and value.

3.     This strategy culminated last week when more than a dozen MiMedx sales employees resigned en masse, with the majority of those leaving to perform sales functions at or for Surgenex as its direct employees or sales agents.

4.     MiMedx understands and respects free and fair competition within its industry. Surgenex does not compete within the privilege of fair competition.  Through its persistent and malicious actions, Surgenex has adopted improper competitive strategies and tactics that go far beyond the boundaries of free and fair competition; it has shown, both through its actions and through express statements that its senior leaders and agents have made to MiMedx employees, agents, and others in the industry, that the goal of Surgenex is to significantly harm MiMedx's business by stealing its commercial infrastructure, including employees and agents, for the purpose of converting their accounts to Surgenex.  Surgenex is not looking to compete fairly, or to compete on product efficacy, or to compete by lowering medical costs, or to compete by doing what is best for patient care; rather Surgenex has made a commitment to take any steps necessary, including entering into business arrangements on questionable economic terms, to compete through unfair and improper methods for the specific purpose of significantly harming MiMedx's business.

5.     Upon information and belief, Surgenex's scheme also includes substantial efforts to improperly solicit MiMedx customers and unlawfully use MiMedx's confidential information, including sensitive and proprietary customer information.

6.     Diaz, a former employee of MiMedx and the current President and Chief Commercial Officer of Surgenex, is a key orchestrator of this unlawful scheme.  Over the past six months, and perhaps longer, Diaz has engaged in unfair competition and

2

conspired with Surgenex and MiMedx employees, including Blocker, to plan and execute Surgenex's raid of MiMedx employees.

7.      Blocker was employed as an Area Vice President at MiMedx, one of the top five sales roles at the company, for more than eight years before he resigned on May 15, 2024.   In this role, Blocker not only had access to confidential and proprietary information but was also heavily involved in developing MiMedx's business strategy. Indeed, Blocker was the only Area Vice President to attend MiMedx's two-day strategic planning retreat in September 2023 when the most sensitive confidential business information and strategy was discussed.  During his employment with MiMedx, Blocker executed two protective covenant agreements with MiMedx as a condition of his employment.

8.      In violation of his obligations contained in those agreements and his fiduciary duties as a high-level key employee of MiMedx, Blocker conspired with Diaz and Surgenex for months to plan and execute Surgenex's raid of MiMedx employees. The raid included the poaching of several Regional Sales Directors who reported directly to Blocker as well as numerous sales associates, referred to as Account Executives, who reported directly to those Regional Sales Directors.

9.      MiMedx is substantially harmed by the unfair competition scheme planned and executed by Defendants.  Specifically, MiMedx has lost more than a dozen employees as of the date of this Complaint, many of them to Surgenex or with plans to serve as sales agents for Surgenex, and upon information and belief, Defendants have been unfairly competing by unlawfully using MiMedx's confidential information and soliciting MiMedx's customers in violation of valid protective covenant agreements.

## PARTIES

10.     Plaintiff MiMedx is a pioneer and leader in the placental biologics industry that has developed a leading portfolio of products for applications in the wound care, burn, and surgical sectors of healthcare.

11.     MiMedx is a local company.  It maintains its headquarters and principal place of business here in Cobb County at 1775 West Oak Commons Court, NE, Marietta, Georgia 30062.

12.     Defendant Surgenex is a foreign limited liability company organized under the laws of the State of Arizona. Surgenex maintains its headquarters and principal place of business at 15444 N 76th Street, Suite 110, Scottsdale, AZ 85260. Through Defendant Diaz, its President and Chief Commercial Officer, Surgenex has maintained a business presence here in the State of Georgia.

13.     Defendant Diaz is a natural person who resides in Georgia.

14.     Defendant Blocker is a natural person who currently resides in Illinois and conducted business on behalf of MiMedx in Georgia and numerous other states.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to GA. CONST. ART. VI § VI, ¶ 1 and O.C.G.A. § 15-6-8 because this is an action asserting breaches of contract, tort claims, and equitable relief.

16.     Venue is proper in this Court under O.C.G.A. § 9-10-93 because Defendants committed tortious acts in Cobb County, Georgia where MiMedx is

headquartered.

17.     Venue and jurisdiction are also proper because Blocker and MiMedx contractually agreed to venue and jurisdiction in the state courts located in Cobb County, Georgia for any disputes arising from the parties' relationship or the parties' protective covenant agreements.

## FACTS GIVING RISE TO THE ACTION

### MiMedx's Business

18.     MiMedx is a publicly traded healthcare corporation headquartered in Cobb County, Georgia that develops, markets, and sells placental tissue allografts derived from donated placental tissue, and other similar products, including xenografts.

19.     MiMedx operates in an industry that is highly regulated by the U.S. Food and Drug Administration ("FDA").   In addition, MiMedx's allograft products are commonly reimbursed by the Centers for Medicare & Medicaid Services ("CMS") based on a reimbursement rate specific to the particular care setting.

20.     MiMedx has a national sales footprint and does business in all fifty states throughout the United States.  MiMedx also has a small but growing international sales footprint, including in Japan and the Middle East.

21.     MiMedx has a sales team that is devoted to promoting and selling the company's products to physicians' groups, hospitals and other health care providers. MiMedx invests substantial time and resources into recruiting, training, and equipping its sales force with information and strategies to successfully market and sell MiMedx's products. As part of that process, MiMedx shares its confidential business information

with its sales team, including customers lists, detailed product information, and other sensitive and proprietary information.

22.     The MiMedx sales team is organized into four areas: Central, East, South, and West. Each area is led by an Area Vice President of Sales, who reports directly to Kim Moller, MiMedx's Senior Vice President of Sales.  Ms. Moller, in turn, reports directly to the company's Chief Executive Officer.

23.     Each Area Vice President manages sales employees in their respective area.  The Account Executives report to Regional Sales Directors, who in turn report directly to the Area Vice President for their area.  In essence, the Area Vice President is the ultimate leader of the sales operations for MiMedx in their respective geographic region.

24.     MiMedx also engages third party vendors ("MiMedx Sales Agents") to provide additional assistance and resources for its sales force.  The MiMedx Sales Agents are companies that execute Sales Agency Agreements with MiMedx.

**Surgenex's Business**

25.     Surgenex is a medical device company headquartered in Arizona. Surgenex is a direct competitor of MiMedx because the company also develops, markets, and sells placental tissue allograft products and other similar products to physicians' groups, hospitals and other health care providers.

26.     Surgenex markets and sells its products through its sales employees and third party contractor sales agents.

27.     Surgenex and its products are also regulated by the FDA and commonly reimbursed by CMS.

28.     Abel Bullock is the Chief Executive Officer of Surgenex. Upon information and belief, Defendant Diaz reports directly to Bullock.

### Diaz's Employment at MiMedx and Transition to Surgenex

29.     Defendant Diaz was formerly employed at MiMedx from 2012 through 2020, and worked at MiMedx's Cobb County headquarters throughout that time.

30.     From 2012 to 2014, Diaz served as a Vice President of Sales Operations at MiMedx.

31.     From 2014 to 2020, Diaz served as the Senior Vice President of Commercial Operations at MiMedx.  In that position, Diaz had access to MiMedx's confidential business information and customer lists.

32.     While employed at MiMedx, Mark Diaz executed a valid Confidentiality and Non-Solicitation Agreement.

33.     Diaz's LinkedIn page claims that while he served as Senior Vice President of Commercial Operations he built and supervised a team of approximately 80 commercial operations employees that provided support to MiMedx's sales force.

34.     MiMedx paid Diaz more than $5,564,959 in total compensation during the time that he was employed by MiMedx.[1]

35.     On or about March 2023, Diaz accepted a position as Surgenex's Chief Commercial Officer; in April 2024, Diaz was promoted to President and Chief Commercial Officer.  His LinkedIn profile states that he is currently serving in that role and is based in the Atlanta Metropolitan Area.

---

[1] This number does not include the compensation Diaz received from MiMedx for the year 2012.

**<u>Blocker's Employment at MiMedx</u>**

36.     Blocker was a senior sales leader at MiMedx, and he held a high-ranking position of confidence and trust during his employment as an Area Vice President of the company.

37.     Defendant Blocker's employment with MiMedx commenced on August 27, 2012.  During his employment with MiMedx, Blocker worked remotely out of the Chicago area and traveled multiple times each year to Georgia for meetings with MiMedx's Management Team and Sales Team at MiMedx's headquarters in Cobb County.

38.     On January 4, 2016, Blocker became MiMedx's Area Vice President of Sales.  In that position, Blocker managed a team which, at the time of his departure from MiMedx, included approximately 70 sales employees and he had the authority and ability to hire, fire, promote, reassign, or demote those employees.

39.     During his tenure at MiMedx, Blocker also worked in additional sales areas including the North Area and the East Area.  During the past two years as Area Vice President of Sales for the Central Area, Blocker managed sales responsibility for Arizona, Colorado, Iowa, Illinois, Indiana, Kansas, Kentucky, Michigan, Minnesota, Missouri, North Dakota, Nebraska, New Mexico, Ohio, South Dakota, Utah, Wisconsin, West Virginia, and Wyoming.

40.     Blocker had material contact with numerous MiMedx employees, including frequent and regular contact with his seven Regional Sales Directors for the

Central Area that directly reported to him, and frequent and regular contact with the approximately 63 Account Executives that reported to those Regional Sales Directors.

41.     As an Area Vice President, Blocker contributed to the compensation plan and quota setting, and in that capacity played a decision-making role in setting compensation levels and structure for MiMedx's sales team on a national level.

42.     Blocker also fulfilled numerous other critical job duties for MiMedx, including overseeing account management, promoting new business development and customer service, establishing and sustaining market coverage through all available products and networks, providing strategic and tactical guidance and leadership to his sales team, and analyzing MiMedx and customer data and trends to identify areas to target for growth.

43.     Blocker frequently had material contact with hundreds of MiMedx customers during the entire time he served as an Area Vice President of Sales, including the customers he directly serviced on behalf of MiMedx, and customers about whom he obtained confidential information as a result of his employment with MiMedx.  Blocker acted as a MiMedx agent when he met with customers of the company, and within certain guidelines he had the authority to (i) negotiate contracts with customers, (ii) set prices and payment terms with customers, and (iii) enter into and bind MiMedx to agreements with its customers.

44.     Blocker regularly met with MiMedx's customers in person, attended sales calls, and closed deals with customers on behalf of MiMedx.  His responsibilities included MiMedx's largest and most important customers in the Central Area.

45.     While serving as an Area Vice President of Sales, Blocker attended weekly staff calls with the Senior Vice President of Sales and the three other Core Area Vice Presidents of Sales and two Surgical Area Vice Presidents.  These meetings also included leaders from marketing, manufacturing, human resources, including internal recruiters, compliance, training, sales operations, reimbursement, national accounts, medical science liaisons, and the medical director team.  In those calls, Blocker was privy to confidential business plans and sales and marketing strategies that were not known to persons outside the company.

46.     Indeed, Blocker participated in the company's two-day strategic planning retreat in September 2023 that resulted in the development of the company's current strategic priorities and operating plan. This retreat was limited to MiMedx's Chief Executive Officer, his direct reports, and a select few other senior leaders, including Blocker.  In fact, Blocker was the only Area Vice President of Sales asked to attend. The confidential information discussed at this offsite retreat was among MiMedx's most sensitive competitive information, including discussion of competitors, MiMedx's strengths and weaknesses vis-à-vis those competitors, and specific discussions around the attempted poaching of employees by Surgenex.

47.     As an Area Vice President, Blocker had the authority to bind MiMedx in contracts up to a value of $250,000, subject to internal processes and controls.

48.     Blocker also had material contact with MiMedx Sales Agents that are authorized to make sales on behalf of MiMedx.  Those MiMedx Sales Agents executed contracts with MiMedx to provide sales services to MiMedx, which included certain sales

quotas. As Area Vice President for the Central Area, Blocker was responsible for ensuring the Sales Agents met their quotas.

49.     Blocker had knowledge of and access to valuable confidential information regarding MiMedx customers, business plans, detailed product information, operational methods, marketing plans and strategies, targeted opportunity data, management planning information, ranking and revenue of each individual sales team member nationwide, business referral sources, technology investments and strategies, organic and inorganic product strategies, and other similar information.

50.     Blocker had meetings with MiMedx's Research and Development ("R&D") department for the purpose of steering MiMedx's decisions as to product selection and investments into particular products. In this capacity, Blocker obtained detailed and sensitive product information regarding MiMedx's product catalog, the current state of its R&D, and R&D pipeline of future and potential products.

51.     Blocker routinely had discussions with MiMedx's Chief Executive Officer regarding product development and the types of products that MiMedx should or should not consider adding to its portfolio.

52.     As an Area Vice President of Sales at MiMedx, Blocker was a key employee within the meaning of O.C.G.A. §§ 13-8-51(8), and 13-8-53(a)(4).  MiMedx has legitimate business interests requiring the company to enter into and enforce noncompete restrictions and other protective covenants in Blocker's written employment agreements.

53.     MiMedx invested significantly in Blocker.  The company provided him direct access to customers located throughout his Central Area and beyond, and

substantial training on sales processes, compliance issues, and placental tissue product information.

54.     MiMedx paid Blocker more than $5,479,439 in total compensation during the time that he was employed by MiMedx.[2]

55.     MiMedx placed high degrees of trust in Blocker and reasonably expected him to act with the utmost good faith and loyalty to MiMedx at all times.

**MiMedx's Legitimate Business Interests and Protective Covenant Agreements**

56.     MiMedx has a legitimate business interest in protecting, among other things, its (a) trade secrets; (b) other valuable confidential business information; (c) relationships with its customers; (d) goodwill in the placental biologics industry throughout the United States; and (e) its investment in specialized training of its employees.

57.     During his employment with MiMedx, Blocker had regular access to the extensive confidential and proprietary business information associated with many of the customer relationships developed, maintained, and protected by MiMedx, as well as other confidential and proprietary business information of great competitive value in the placental biologics industry, including, among other things, business plans, detailed product information, operational methods, marketing plans and strategies, management planning information, business referral sources, technology investments and strategies, and other similar information.  He had access to nonpublic business information about MiMedx and its customers and business strategies not just in the sales area for which he was ultimately responsible but in all other areas of the company.

---

[2] This number does not include the compensation Blocker received from MiMedx for the year 2012.

58.     During his employment with MiMedx, and by reason of MiMedx substantial investment and trust in him, Blocker maintained and built important relationships and goodwill with many of MiMedx's customers.  Blocker would not have had the valuable relationships with these customers if not for his MiMedx employment and the company's investment of resources to create and maintain those relationships.

59.     Additionally, MiMedx devoted substantial time and expense to providing specialized training to Blocker during his employment with MiMedx.

60.     MiMedx takes reasonable measures to protect its legitimate business interests.  It does not share confidential business information and would never disclose this information to a competitor.  It also takes extensive steps to ensure the confidentiality of the customer information entrusted to MiMedx.

61.     MiMedx requires all employees to abide by its confidentiality policies, including requiring them to treat as confidential any information shared with them concerning MiMedx customers.  MiMedx also requires certain key employees, including Blocker, to execute protective covenant agreements at the inception of or during employment.  MiMedx understands the irreparable injury that could be done by the disclosure of its confidential and proprietary business and customer information by current and former employees and also seeks to protect its substantial investment in developing strong customer relationships and goodwill.  Accordingly, non-disclosure provisions and other contractual provisions designed to protect these interests are included in MiMedx's protective covenant agreements.

<u>Blocker's Non-Competition Agreement with MiMedx</u>

62.     As a condition of his MiMedx employment, Blocker entered into a written Non-Competition Agreement with MiMedx dated December 12, 2017 (the "Non-Competition Agreement"), that contains a non-competition covenant intended to protect MiMedx legitimate business interests.   A true and correct copy of the Agreement is attached to this complaint as **Exhibit 1**.

63.     The Non-Competition Agreement is a fully valid and enforceable contract entered into between Blocker and MiMedx in exchange for due consideration.

64.     Under the Non-Competition Agreement, Blocker agreed not to engage in or supervise sales, marketing, customer service, account management or sales support activities in competition with MiMedx within the territory in which he performed services on behalf of MiMedx, throughout the period of his employment and for a period of one year following the termination of his employment with MiMedx.

65.     Specifically, Section 2 of the Non-Competition Agreement (the "Non-Competition Covenant") provides in relevant part as follows:

2. <u>Non-Competition</u>. During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory (as such term is defined below in Section 2 of this Agreement), either directly or indirectly, (i) engage in, coordinate, supervise, or manage sales, marketing, customer service, account management, or sales support for any business offering products or services competitive with those offered by the Company; (ii) provide the same or similar services, engage in the same or similar activities, or manage the same or similar services as those provided or engaged in by Employee for or on behalf of the Company within two (2) years prior to the Termination Date for any business offering products or services competitive with those offered by the Company; or (iii) serve in a general management capacity or engage in general management activities for any business offering products or services competitive with those offered by the Business.

66.    The Non-Competition Covenant defines the applicable territory as all states where Blocker performed services on behalf of MiMedx within two years prior to the termination of his employment with MiMedx.

67.    Specifically, the Non-Competition Covenant provides in relevant part as follows:

> For purposes of this Agreement, "Territory" means any state in which Employee performs services on behalf of the Company and any U.S. state in which a customer to which Employee provides services on behalf of the Company is located at any time during Employee's relationship with the Company.  Employee agrees and acknowledges that as of the Effective Date, the Employee will be providing services on behalf of the Company in each of the U.S. states indicated below.  The Employee further agrees and acknowledges that from time to time during the course of Employee's employment with the Company, Employee may begin to provide services in other U.S. states not indicated below in which a customer to which Employee provides services on behalf of the Company after the Effective Date, is located ("Additional States").  Upon the Employee's Termination Date, the combination of the states indicated below plus such Additional States shall form the Territory in which this Agreement is enforced.  Such Additional States and the states indicated below will be limited to those in which the above-described services were provided by the Employee on behalf of the Company within two (2) years prior to the Termination Date. . . . Illinois . . . Indiana . . . Iowa . . . Kansas . . . Michigan . . . Minnesota . . . Missouri . . . Nebraska . . . North Dakota . . . Ohio . . . South Dakota . . . [and] Wisconsin.[3]

68.    In the Non-Competition Agreement, Blocker warranted that the restraints imposed in the Non-Competition Covenant are necessary for the protection of MiMedx's business, do not impose an undue economic hardship on Blocker, and are reasonable in respect to subject matter, length of time, and geographic area.  Specifically, Section 7 of the Non-Competition Agreement provides as follows:

---

[3] The parties checked boxes for each of these states to indicate that they were included in Blocker's territory.  Following a reorganization that occurred after the Non-Competition Agreement was executed, Blocker's Territory included Arizona, Colorado, Iowa, Illinois, Indiana, Kansas, Kentucky, Michigan, Minnesota, Missouri, North Dakota, Nebraska, New Mexico, Ohio, South Dakota, Utah, Wisconsin, West Virginia, and Wyoming.

15

Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee; (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

69.     In the Non-Competition Agreement, Blocker acknowledged that MiMedx is engaged in a highly competitive business, the Non-Competition Covenant is necessary to protect MiMedx's business, goodwill, and trade secrets, and that Blocker had attained a high level of influence with MiMedx's customer by virtue of MiMedx's time, training, and trust instilled in Blocker.

70.     Section 1 of the Non-Competition Agreement provides in relevant part as follows:

(a) The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and other existing or future products developed, manufactured, marketed, authorized, offered or provided by the Company (the "Business").

(b) The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (1) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c) Employee: (i) by reason of the Company's Investment of time, training, money, trust exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

16

(d) In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

71.     The Non-Competition Agreement contains a Georgia choice of law provision.  Specifically, Section 10 of the Non-Competition Agreement provides in relevant part as follows: "This Agreement has been entered into under and shall be governed by the laws of the State of Georgia."

72.     The Non-Competition Agreement contains a mandatory forum selection clause requiring any disputes to be litigated in Cobb County, Georgia.  Specifically, Section 10 of the Non-Competition Agreement provides in relevant part as follows:

> The parties agree that the state and federal courts located in Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement.  Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship.  Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

73.     Finally, Section 13 of the Non-Competition Agreement addresses Blocker's obligation to pay attorneys' fees and costs for an action to enforce the Non-Competition Agreement:

> If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs

(including reasonably attorney's fees and expert fees) incurred by the Company in such proceeding.

### Blocker's Non-Solicitation Agreement with MiMedx

74.     As a condition of his MiMedx employment, Blocker also entered into a written Confidentiality and Non-Solicitation Agreement with MiMedx, dated December 29, 2017 (the "Non-Solicitation Agreement"), that contains a protective covenant intended to protect MiMedx legitimate business interests.  A true and correct copy of the Non-Solicitation Agreement is attached to this complaint as **Exhibit 2**.

75.     The Non-Solicitation Agreement is a fully valid and enforceable contract entered into between Blocker and MiMedx in exchange for due consideration.

76.     In the Non-Solicitation Agreement, Blocker agreed that he would not disclose or improperly use MiMedx's confidential information, while employed and for a period of three years following the termination of his employment, as long as such information remains confidential.

77.     Specifically, Section 3 of the Non-Solicitation Agreement (the "Confidentiality Covenant") provides in relevant part as follows:

> Employee shall (i) hold all Confidential Information in trust and confidence and not directly or indirectly, divulge, publish or disclose the Confidential Information, whether it is tangible or intangible, to (A) any third party, or (B) any employee or contractor of the Company not authorized to access the Confidential Information, without prior written consent of the Company; (ii) not copy or remove from the Company offices any Confidential Information or Trade Secrets without prior written consent of the Company; and (iii) not use the Confidential Information for Employee's personal benefit or for the benefit of any third party, except as otherwise required pursuant to valid judicial order, provided Employee shall provide prompt written notice of such order to,

and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee's obligations under this Section 3 as it relates to Confidential Information that is a trade secret under the Act shall apply as long as the Confidential Information remains a trade secret under the Act, and Employee's obligations under this Section 3 as it relates to Confidential Information that does not constitute trade secrets under the Act shall apply for three (3) years or as long as the Confidential Information remains confidential, whichever is shorter. . . .

78.     Section 1(d) of the Non-Solicitation Agreement defines "Confidential

Information" as follows:

(i) all non-public information in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems concerning the Company, its parent and the other subsidiaries of its parent relating to their respective businesses, operations, personnel, properties or finances which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time in connection with Employee's employment with the Company; (ii) all tangible reproductions or embodiments of the information described in (i); (iii) all notes, analyses, compilations, studies, interpretations or other documents, and all copies thereof, prepared by Employee, which contain, reflect or are based upon, in whole or in part, any of the information described in (i). Confidential Information includes, but is not limited to, data, reports (including, but not limited to. weekly task list reports and clinical research reports), analyses (including, but not limited to, analyses of competitive products and potentially competitive emerging technologies), matrices, notes, interpretations, protocols, forecasts, testing, methods and analysis of test results, records, models (including, but not limited to, the models of studies performed), documents, agreements, business plans, budgeting information, customer lists, the identity of and information relating to suppliers, business partnerships and acquisition targets, financial statements and other financial information of the Company and its customers or suppliers, know-how, strategic or technical data, research (primary and basic), clinical trial data and outcomes, technology (including without limitation all processing, manufacturing and related technology), designs, developments, inventions, data and any components thereof, whether or not copyrightable, intellectual property and trade secrets, whether or not patented or patentable, patent programs and strategies, sales and marketing data, marketing research data, marketing strategies, marketing materials (including, those in draft form), product information (including, but not limited to, the composition and structure of

19

products, manufacturing processes for products, histology of products, biologic activity of products, internal opinions on the efficacy of products, and research team conclusions on products), product research and development data, sample product information, information discussed during lab meetings, software programs (including source code), pricing information and strategies, information provided by third parties which the Company has a duty to protect from disclosure.

The term "Confidential Information" does not include, however. Information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to Employee being furnished by or on behalf of the Company, provided that the Information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (d) is explicitly approved for release by written authorization of the Company.

79.     In the Non-Solicitation Agreement, Blocker also agreed that he would return to MiMedx all MiMedx property and information immediately upon written request from MiMedx.

80.     Specifically, Section 4 of the Non-Solicitation Agreement (the "Return of Property Covenant") provides as follows:

Employee agrees and acknowledges that all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and Information storage and retrieval devices are the sole and exclusive property and information of the Company and that the Company has not conveyed any ownership interest in any such items to Employee. Employee agrees to return all of the Company's property and information (i) within three (3) days following the end of Employee's employment with the Company for any reason, or (ii) immediately upon the Company's written request to Employee. To the extent Employee maintains property and information belonging to Company In electronic form on any computers or other electronic devices owned by Employee,

20

Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

81.     In the Non-Solicitation Agreement, Blocker also agreed that he would not solicit MiMedx customers while employed at MiMedx and for a period of one year following the termination of his employment.

82.     Specifically, Section 5 of the Non-Solicitation Agreement (the "Non-Solicitation Covenant") provides as follows:

While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business from any of the Customer or actively sought potential Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company, for purposes of providing any products or services competitive with those provided by the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment of the Company utilizing or taking advantage of) those substantial contracts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company.

83.     Section 1(b) of the Non-Solicitation Agreement defines "Customer of Company" as "a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others."

84.     Section 1(c) of the Non-Solicitation Agreement defines "Material Contact" as follows:

[T]he contact between Employee and each Customer or potential Customer of the Company: (i) with whom or with which Employee dealt on behalf of the Company in an effort to initiate, maintain or further a business relationship between the Company and the Customer or potential Customer; (ii) whose dealings with the Company were coordinated or supervised by Employee; (iii) about whom Employee obtained confidential information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within the last two (2) years of Employee's employment with the Company.

85.     In the Non-Solicitation Agreement, Blocker also agreed that he would not recruit MiMedx employees while employed at MiMedx and for a period of one year following the termination of his employment.

86.     Specifically, Section 6 of the Non-Solicitation Agreement (the "Employee Non-Recruitment Covenant") provides as follows:

While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent for the purpose of encouraging, enticing, or causing the employee to terminate employment with the Company, or hire or engage the services of such employee, to provide products or services that are competitive with those provided by the Company.

87.     In the Non-Solicitation Agreement, Blocker agreed that the restraints imposed in the Non-Solicitation Agreement are reasonable, necessary for the protection of MiMedx's business, and do not impose an undue economic hardship on Blocker. Specifically, Section 7 of the Non-Solicitation Agreement provides as follows:

Employee agrees and acknowledges that the restraints imposed upon Employee under Sections 5 and 6: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business.

88.     In Section 8 of the Non-Solicitation Agreement, Blocker also acknowledged that MiMedx is engaged in a highly competitive business, contractual protection is necessary to protect MiMedx's business, goodwill, and trade secrets, and that Blocker had attained a high level of influence with MiMedx's customer by virtue of MiMedx's time, training, and trust instilled in Blocker.

89.     The Non-Solicitation Agreement contains a Georgia choice of law provision.  Specifically, Section 9 of the Non-Solicitation Agreement provides in relevant part as follows: "All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws."

90.     The Non-Solicitation Agreement contains a forum selection clause in favor of Cobb County, Georgia.  Specifically, Section 9 of the Non-Solicitation Agreement provides in relevant part as follows:

> Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County, Georgia.

91.     Finally, Section 14 of the Non-Solicitation Agreement addresses Blocker's obligation to pay attorneys' fees and costs for an action to enforce the Non-Solicitation Agreement:

> If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonably attorney's fees and expert fees) incurred by the Company in such proceeding.

**Surgenex, Diaz, and Blocker Conspire to Unfairly Compete Against MiMedx**

92.     During at least the past six months, and during the time that Blocker remained employed at MiMedx, Defendants began conspiring to unfairly compete against MiMedx in multiple ways.

93.     Since at least summer 2023, Diaz and Surgenex began strategizing to raid MiMedx's sales team and recruit the leaders and highest performers to leave MiMedx for Surgenex.  Upon information and belief, Blocker began arranging his employment with Surgenex and conspiring with Diaz and Surgenex in violation of his fiduciary duties during or around November 2023.

94.     To further their scheme, Defendants arranged phone calls and in person meetings with numerous MiMedx sales employees for the purpose of soliciting them to leave MiMedx for Surgenex and violate their protective covenant agreements.

95.     During this same time period, Blocker was acting as a Trojan Horse to actively recruit members of his sales team and other MiMedx sales employees that he knew to leave MiMedx with him and perform sales activities for Surgenex in violation of their protective covenant obligations.

96.     Given his high-ranking position as Area Vice President of Sales for the Central Area, and deep involvement with MiMedx's sales strategy and compensation, Blocker was uniquely positioned to leverage his inside information to identify high performing sales employees for Defendants' raid.

97.     To further Defendants' scheme, Blocker prioritized and privileged the sales team employees that agreed to join the employee raid and abandon MiMedx while "freezing out" employees that remained loyal to MiMedx and declined to join Blocker.

98.     Upon information and belief, Defendants openly disparaged and undermined MiMedx's company management and operations and financial solvency.

99.     Defendants also utilized other current and former MiMedx employees to further their scheme.  For instance, Rob Piekarczyk, a former Regional Sales Director who worked under Blocker and was terminated for performance issues by MiMedx in August 2023, was also used to improperly attempt to recruit MiMedx's current employees.  At the direction of Diaz, Piekarczyk violated the employee non-recruitment covenant in his Confidentiality and Non-Solicitation Agreement by recruiting and soliciting MiMedx sales employees who previously reported to him and encouraging them to speak to Diaz about joining Surgenex.

100.     During late 2023, several MiMedx sales employees left the company and began working at Surgenex.

101.     Defendants had knowledge of the protective covenant agreements executed in favor of MiMedx, including because Blocker was currently covered by such agreements and Diaz had previously executed a similar agreement while he was employed at MiMedx.

102.     In addition, the General Counsel of MiMedx sent a letter to Abel Bullock, the Chief Executive Officer of Surgenex, on November 29, 2023 to inform Surgenex that Surgenex was employing multiple former MiMedx employees and those employees had executed protective covenant agreements with MiMedx.  A true and correct copy of that letter is attached to this complaint as **Exhibit 3**.

103.     The November 29 letter also informed Surgenex that "MiMedx believes Surgenex is specifically targeting MiMedx employees, especially Account Executives

and other sales personnel, for employment at Surgenex" and informed Surgenex that those employees had also executed protective covenant agreements with MiMedx.

104.    Despite the November 29 letter, Defendants' conspiracy and plan continued unabated and Blocker continued to work against MiMedx from inside of the company and in violation of his fiduciary duties.  For a period of many months, Blocker was acting as Surgenex's secret agent and de facto recruiter while he was being paid handsomely by MiMedx to serve as the company's Area Vice President.

105.    Defendants' malicious and improper strategy as admitted to MiMedx employees by Diaz on several occasions, including during conversations at both the fall 2023 and spring 2024 Society for Advanced Wound Care conferences, is to harm MiMedx's sales operation to such a degree it could replace MiMedx and/or drive down the stock price so that Surgenex could purchase MiMedx. Upon information and belief, Diaz made similar statements regarding Surgenex's intention to harm MiMedx in his numerous conversations with MiMedx employees, many of whom had he worked with historically while at MiMedx.

106.    Defendants knew their activities were improper and unlawful, as evidenced by their attempt to cover their tracks during the recruitment process by requiring MiMedx employees that held discussions with them to sign nondisclosure agreements.

107.    As one means of inducing them to breach their common law and contractual obligations to MiMedx, Surgenex promised MiMedx employees additional bonuses if they breached their employee non-recruitment covenants and recruited additional colleagues to leave MiMedx and join Surgenex.

108.    In addition, as another means of inducing them to breach their common law and contractual obligations to MiMedx, Defendants promised MiMedx employees that Surgenex would indemnify the employees in the event of litigation and told MiMedx employees that Surgenex had obtained insurance for this specific purpose. Surgenex and Diaz made these promises to MiMedx employees to induce them to resign from MiMedx and to breach their obligations to MiMedx with perceived impunity, and Surgenex and Diaz did so prior to the commencement of this litigation.

109.    Diaz also contacted one or more MiMedx Sales Agents and attempted to solicit those contractors to terminate their contractual relationship with MiMedx and begin working on behalf of Surgenex.

110.    Diaz also began contacting marketing employees and other corporate employees of MiMedx to solicit them to leave MiMedx for Surgenex.

111.    As a result of Defendants' sustained campaign of employee raiding, during or around April 2024 MiMedx's senior leadership communicated with all four of its Core Area Vice Presidents of Sales, including Blocker, and the two Surgical Area Vice Presidents to inquire about Surgenex and its improper efforts to harm MiMedx. At that time, Blocker knew about Surgenex's ongoing campaign to raid the MiMedx sales force.  Despite his knowledge of Surgenex and its recruiting efforts, Blocker failed to provide true and complete answers to the questions asked of him by his direct manager. Blocker's statements and omissions were intentionally false and amounted to fraud.

**Blocker's Departure from MiMedx and Defendants' Continuing Wrongful Conduct**

112.    On May 10, 2024, Blocker resigned from MiMedx and informed MiMedx that he was changing jobs.  MiMedx asked Blocker where he would be working next.

Blocker refused to disclose the name of his next company but did concede that he was resigning to take a job with a direct competitor of MiMedx.

113.    MiMedx has since learned that Blocker is working with Surgenex in a sales capacity.

114.    Blocker's sales activities with Surgenex have resulted, or imminently will result, in the wrongful obtaining, retaining, use, and/or disclosure of MiMedx's trade secrets and confidential information, including but not limited to current and future business plans, current and future product designs, information regarding MiMedx's employees and customers, and financial information, for the benefit of himself or some other person or entity.

115.    During the course his employment with MiMedx, Blocker had full, unfettered access to, and obtained, confidential proprietary information regarding current and prospective customers in Blocker's area and other MiMedx customers.  Blocker also had access to business, strategic, and marketing plans; financial, budgetary, and revenue forecast information for MiMedx's entire sales force; and other confidential and proprietary information about MiMedx and its products and services.  Given Blocker's employment at Surgenex and the fact that Surgenex and MiMedx are direct competitors, in the course of Blocker's employment with or sales activities for Surgenex he will inevitably use and disclose MiMedx's confidential information and/or trade secrets in the performance of his duties.

116.    Since Blockers' departure on May 10, approximately a dozen members of the Central Area sales team that he managed have also resigned.

117.    On May 20, 2024, MiMedx, through its outside counsel, sent Blocker a letter reminding him of his legal and contractual obligations in the Non-Competition Agreement and the Non-Solicitation Agreement, including the protective covenants contained therein. A true and correct copy of the letter is attached to this complaint as **Exhibit 4**.

118.    The May 20 letter also advised Blocker that MiMedx would be filing claims against him and informed him of his "legal obligation to preserve any and all evidence that may be relevant to an imminent legal dispute."

119.    Blocker's work for Surgenex is a direct violation of the Non-Competition Covenant in his Non-Competition Agreement with MiMedx.

120.    The Non-Competition Covenant expressly prohibits Blocker from working in his current capacity for Surgenex because he is providing or engaging in the same or similar services as those he provided or engaged in for or on behalf of MiMedx within the restricted territory.

121.    Upon information and belief, Blocker has used the confidential information and customer information obtained during his employment at MiMedx to unfairly compete for MiMedx customers, and/or solicited MiMedx customers, in further violation of the Agreement.

122.    Blocker's unlawful competition in breach of his Agreement stands to cause significant and irreparable harm to MiMedx due to Blocker's substantial relationships with many of MiMedx's customers.

123.    As a result of Blocker's conduct and should Blocker be permitted to continue his course of conduct, MiMedx has and will continue to suffer irreparable harm

in the form of loss of goodwill, actual loss of customers, exposure of its confidential information the resulting loss of competitive advantage, among other things.

124.    Additionally, as a direct consequence of Defendants' wrongful conduct, MiMedx has incurred and will continue to incur substantial expense to enforce Blocker's contractual agreements.

125.    On May 20, 2024, MiMedx, through its outside counsel, also sent separate letters to Surgenex and Mark Diaz informing them that MiMedx was aware that former MiMedx employees were working at Surgenex and otherwise violating their legal and contractual obligations to MiMedx, and informing them that MiMedx was aware of and investigating their months long campaign to riad MiMedx's employees and engage in unfair competition.  True and correct copy of these letter are attached to this complaint as **Exhibit 5 and 6**.

126.    The May 20 letters to Surgenex and Diaz demanded that Defendants cease and desist "from any and all actions that constitute unfair competition, misuse of confidential information, breaches of contractual duties, and interference with contract rights, and improper recruitment of MiMedx employees" and demanded assurances by Wednesday, May 22 of all steps taken to ensure compliance with former employees' contractual obligations to MiMedx.  The letters also demanded the immediate return of any and all information about MiMedx's business and clients that are in the possession of Surgenex or on the electronic devices of former MiMedx employees now employed by Surgenex.

127.    As of the date of this filing, Blocker, Surgenex, or Diaz have provided no response or assurances to MiMedx as demanded.

30

128.     In fact, even after the letters to Blocker, Surgenex, and Diaz were received by them, Defendants have continued their efforts to unlawfully solicit and raid MiMedx's employees, including contacting a currently employed MiMedx Account Executive on May 23 and requesting to meet with her in person to discuss recruitment.  Defendants' continued actions reflect their brazen strategy to thumb their nose at their legal and contractual obligations, as well as the concept of free and fair competition.

## COUNT I

### Breach of Non-Competition Agreement (Against Blocker)

129.     MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 128 above.

130.     The Non-Competition Agreement signed by Blocker is a valid and enforceable contract pursuant to O.C.G.A. § 13-8-53.

131.     MiMedx has a legitimate business interest in protecting its customer relationships, goodwill, and confidential information and/or trade secrets, justifying the Non-Competition Covenant in the Non-Competition Agreement pursuant to O.C.G.A. §§ 13-8-51 and 13-8-55.

132.     The Non-Competition Covenant expressly prohibits Blocker from working in his current capacities for Surgenex because he is providing or engaging in the same or similar services as those he provided or engaged in for or on behalf of MiMedx during his employment with MiMedx, within the restricted geographic area and time period agreed to in the Non-Competition Covenant.

133.     In his current work for Surgenex, Blocker is actively breaching his Non-Competition Covenant in the Non-Competition Agreement with MiMedx.

31

134.    MiMedx is entitled to monetary damages resulting from the breach of the Non-Competition Agreement between MiMedx and Blocker.

135.    In addition to monetary damages, MiMedx is entitled to a permanent injunction to prevent Blocker from inflicting further harm to MiMedx by continuing to violate the Non-Competition Covenant.

**COUNT II**

**Breach of Non-Solicitation Agreement (Against Blocker)**

136.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 135 above.

137.    The Non-Solicitation Agreement signed by Blocker is a valid and enforceable contract pursuant to O.C.G.A. § 13-8-53.

138.    MiMedx has a legitimate business interest in protecting its customer relationships, goodwill, and confidential information and/or trade secrets, justifying the Non-Solicitation Agreement pursuant to O.C.G.A. §§ 13-8-51 and 13-8-55.

139.    The Non-Solicitation Agreement contains a Non-Solicitation Covenant, an Employee Non-Recruitment Covenant, and a Confidentiality Covenant, each expressly prohibiting Blocker from engaging in restricted activities during his employment and within the restricted post-employment time periods agreed to in the Non-Solicitation Agreement.

140.    During his employment with MiMedx and continuing through his current employment work for or on behalf of Surgenex, Blocker has breached and continues to breach the Employee Non-Recruitment Covenant in his Non-Solicitation Agreement with

MiMedx by recruiting, soliciting, and encouraging MiMedx employees to terminate their employment with MiMedx and begin working with or for Surgenex.

141.    Upon information and belief, during his employment with MiMedx and continuing through his current employment with Surgenex, Blocker breached and continues to breach the Non-Solicitation Covenant in his Non-Solicitation Agreement with MiMedx by soliciting and attempting to solicit MiMedx's customers and actively sought potential customers for the purpose of providing them products and services in that are competitive with MiMedx.

142.    Upon information and belief, during his employment with MiMedx and continuing through his current employment with Surgenex, Blocker breached and continues to breach the Confidentiality Covenant in his Non-Solicitation Agreement with MiMedx by disclosing MiMedx's confidential information to Surgenex employees and using such confidential information for his own benefit and the benefit of Surgenex.

143.    MiMedx is entitled to monetary damages resulting from the breach of the Non-Solicitation Agreement between MiMedx and Blocker.

144.    In addition to monetary damages, MiMedx is entitled to a permanent injunction to prevent Blocker from inflicting further harm to MiMedx by continuing to violate the Non-Solicitation Agreement.

## COUNT III

### Breach of Fiduciary Duty (Against Blocker)

145.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 144 above.

146.   Blocker owed the highest level of fiduciary duties to MiMedx during his employment including the duty of loyalty.

147.   Blocker was employed as Area Vice President of Sales at MiMedx since 2016, a senior leadership role, and served as a member of multiple critical working groups on sales employee compensation, product development and acquisition, and strategic planning.

148.   Blocker managed a team of approximately 70 sales employees and could hire, fire, promote, demote, and reassign the employees that he managed.

149.   Blocker had the authority to bind MiMedx in contracts with a value up to $250,000, subject to internal processes and controls.

150.   Blocker served as a liaison to MiMedx's customers and communicated directly with customers on MiMedx's behalf.

151.   Blocker was in a position to pilfer MiMedx's confidential and proprietary information and, upon information and belief, did pilfer such information for his own benefit and the benefit of Surgenex.

152.   In breach of his fiduciary duties, while employed at MiMedx Blocker conspired with the other Defendants to raid MiMedx's employees by soliciting them to terminate their employment with MiMedx and to join Surgenex.

153.   Upon information and belief, Blocker also breached his fiduciary duties by soliciting and attempting to solicit MiMedx's customers and actively sought potential customers on behalf of Surgenex and sharing MiMedx's confidential information with Surgenex.

154.    During his employment with MiMedx, Blocker consumed MiMedx's time and resources to solicit MiMedx employees to work for Surgenex, a competing business. He engaged in several activities that were designed to compete directly against MiMedx.

155.    Blocker's wrongful conduct disrupted the lawful conduct of MiMedx's business and has caused immediate, substantial, and ongoing injury to MiMedx, including economic harm in the form of the disruption and damage to MiMedx's relationships with its valued employees, the continuing loss of its competitive position, loss of market share, and lost profits.

156.    MiMedx is entitled to monetary damages resulting from Blocker's breach of his fiduciary duties because his actions inflicted harm to MiMedx's business interests.

157.    Blocker's breach of fiduciary duty was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and was foreseeably likely to cause to MiMedx, so that punitive damages should be imposed on Blocker.

## COUNT IV

### Misappropriation of Trade Secrets (Against All Defendants)

158.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 157 above.

159.    Blocker and Diaz have misappropriated data and information of MiMedx that are not commonly known by or available to the public, derive economic value from not being generally known and not being readily ascertainable by proper means by persons who can obtain economic value from their disclosure and use, and that were subject to reasonable efforts by MiMedx to maintain their secrecy.

160.    During their employment, Blocker and Diaz were given access to, and possessed, trade secrets and confidential business information pertaining to MiMedx's business, including but not limited to customer lists, pricing lists, and specialized knowledge of business information and strategies, that confer on MiMedx a competitive advantage over other companies in the industry that do not have or use such information.

161.    MiMedx's confidential and proprietary information includes, inter alia, MiMedx's: (a) customer needs and preferences; (b) pricing and margin information; (c) product, marketing, and long-term strategies; (d) technologies, software, and product development pipeline; (e) nonpublic information about MiMedx employee performance and compensation, and (f) other sensitive, non-public information about MiMedx, its business, its customers, and its employees.

162.    The confidential and proprietary information to which Blocker and Diaz were exposed and had access during their employment with MiMedx, including the information referenced in Paragraph 156, constitute trade secrets within the meaning of applicable state law.

163.    Diaz holds a senior leadership position with Surgenex with responsibilities that encompass the same types of responsibilities he had at MiMedx as well as additional responsibilities.  Upon information and belief, Blocker holds a position with Surgenex comparable to the position he held with MiMedx.

164.    MiMedx takes numerous reasonable steps to protect its confidential, proprietary, and trade secret information, as evidenced by the obligations the company placed on employees pursuant to its protective covenant agreements regarding the safekeeping of trade secrets and confidential information, and the numerous notices and

cease and desist letters MiMedx has issued to former employees reminding them of those obligations.

165. Upon information and belief, Blocker and Diaz misappropriated these trade secrets in the impermissible solicitation of MiMedx's actual and/or prospective clients, customers, vendors, distributors, and others to further Defendants' business interests.

166. Blocker and Diaz misappropriated these trade secrets in the impermissible solicitation of MiMedx's employees to further Defendants' business interests.

167. Upon information and belief, Blocker and Diaz misappropriated these trade secrets by at least revealing and using technical information, financial information, customers and/or vendor information, and/or other business information.

168. Blocker and Diaz acted as an agent of Surgenex when they wrongfully misappropriated MiMedx's trade secrets and/or confidential business information and has, on behalf of Surgenex, used and is continuing to use MiMedx's trade secrets and confidential business information to Defendants' pecuniary advantage.

169. Through their misappropriation of MiMedx's trade secrets and/or confidential business information, Defendants have proximately caused substantial injury to MiMedx. As a direct and proximate result of this misappropriation of its trade secrets, MidMex lost its competitive position, goodwill, sales, and its investment in time and energy in generating its confidential information. Surgenex is vicariously liable for this injury and damage.

170. Defendants are being or will be unjustly enriched by their misappropriation of MiMedx's trade secrets and, unless restrained, Defendants will

continue to use, divulge, and otherwise misappropriate MiMedx's trade secrets and confidential information.

171.    Defendants are not entitled to any revenues that it has realized stemming from the unlawful acts that Blocker has committed on behalf of Surgenex. Surgenex must disgorge and return to MiMedx all such payments. MiMedx is likewise entitled to all other damages available at law as well as all available equitable relief.

172.    Defendants' misappropriation of MiMedx's trade secrets was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and was foreseeably likely to cause to MiMedx, so that punitive damages should be imposed on Defendants.

## COUNT V

### Tortious Interference with Contractual Relations (Against All Defendants)

173.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 172 above.

174.    Valid contractual relationships exist between MiMedx and its employees and contractor MiMedx Sales Agents.

175.    Defendants had knowledge that valid contractual relationships existed between MiMedx and its employees and contractor MiMedx Sales Agents.

176.    Defendants, acting with that knowledge, wrongfully and without privilege, solicited and/or attempted to solicit employees and MiMedx Sales Agents to breach their obligations to MiMedx by accepting positions or engagements with Surgenex, or by otherwise providing sales services to Surgenex, a direct competitor, to perform substantially the same services performed at MiMedx.

177.    Defendants actually attracted away a significant percentage of personnel and attempted to hire all, or virtually all of the sales team in MiMedx's Central Area.

178.    MiMedx must depend on these employees and former employees to function.

179.    Defendants intentionally induced and/or caused employees and MiMedx Sales Agents to breach their obligations to MiMedx and acted purposefully and with malice to injure MiMedx and to benefit Surgenex at the expense of MiMedx.

180.    Defendants used improper means to interfere with MiMedx's contractual relations, including attempting to cover their tracks by requiring MiMedx employees to sign nondisclosure agreements before holding recruitment discussions and promising MiMedx employees that Surgenex would indemnify them.

181.    Surgenex and Diaz are strangers to the contracts between MiMedx and its employees and MiMedx Sales Agents.

182.    Blocker is a stranger to the contracts between MiMedx and its employees and MiMedx Sales Agents, except for his Non-Competition Agreement and Non-Solicitation Agreement and this cause of action is not asserted against Blocker with respect to his contracts.

183.    Any acts done while Blocker was still employed by MiMedx were outside the scope of his agency as they favored a competitor and injured Blocker's principal, MiMedx.

184.    Defendants were motivated substantially by malice and personal interest in their interference with these employment relationships, rather than the furtherance of legitimate business interests.

185.     As a direct and proximate result of Defendants' willful misconduct, MiMedx has sustained and/or will inevitably sustain substantial damage and will continue to sustain damages in the future in an amount to be proved at trial.

186.     Defendants' tortious interference was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and was foreseeably likely to cause to MiMedx, so that punitive damages should be imposed on Defendants.

## COUNT VI

### Tortious Interference with Business Relations (Against All Defendants)

187.     MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 186 above.

188.     Defendants, wrongfully and without privilege, solicited and/or attempted to solicit employees and MiMedx Sales Agents to breach their obligations to MiMedx by accepting positions or engagements with Surgenex, or by otherwise providing sales services to Surgenex, a direct competitor, to perform substantially the same services performed at MiMedx.

189.     Upon information and belief, Defendants also, wrongfully and without privilege, solicited and/or attempted to solicit customers of MiMedx to terminate their relationship with MiMedx and purchase products from Surgenex instead.

190.     Defendants purposefully, with malice and with the intent to injure MiMedx's business induced and/or caused employes, MiMedx Sales Agents, and/or customers to not enter into or continue business relations with Plaintiffs.

191.     Defendants used improper means to interfere with MiMedx's business relations, including attempting to cover their tracks by requiring MiMedx employees to

sign nondisclosure agreements before holding recruitment discussions and promising MiMedx employees that Surgenex would indemnify them.

192.    Defendants are strangers to the business relations between MiMedx and its employees and MiMedx Sales Agents.

193.    Defendants were motivated substantially by malice and personal interest in their interference with these employment relationships, rather than the furtherance of legitimate business interests.

194.    As a direct and proximate result of Defendants' willful misconduct, MiMedx has sustained and/or will inevitably sustain substantial damage and will continue to sustain damages in the future in an amount to be proved at trial.

195.    Defendants' tortious interference was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and was foreseeably likely to cause to MiMedx, so that punitive damages should be imposed on Defendants.

<u>**COUNT VII**</u>

<u>**Civil Conspiracy (Against All Defendants)**</u>

196.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 195 above.

197.    Blocker, Diaz, and Surgenex acted in concert and engaged in conduct constituting the Tortious Interference with Business Relations, Tortious Interference with Contractual Relations, Breach of Fiduciary Duty, and the Misappropriation of Trade Secrets. The Defendants also conspired to enable Blocker and others to breach their contractual obligations to MiMedx.

198.    MiMedx suffered damages as a result of this conspiracy and the aforementioned causes of action, including but not limited to loss of employees and interference with its contractual and business relationships.

199.    The Defendants acted in concert, engaging in conduct that constitutes one or more of the tort or statutory or contract claims more fully set forth in this Complaint.

200.    As a result, the liability of each Defendant who so acted in concert should be extended and imputed to each other such Defendant with the result being that all involved Defendants are liable to MiMedx for monetary damages.

201.    Defendants' civil conspiracy was willful, wanton, and malicious, and in reckless disregard of the harm they were causing and was foreseeably likely to cause to MiMedx, so that punitive damages should be imposed on Defendants.

<u>COUNT VIII</u>

**<u>Attorneys' Fees and Expenses (Against Blocker)</u>**

202.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 201 above.

203.    Blocker acknowledged and agreed in the Non-Competition Agreement and Non-Solicitation Agreement that, if MiMedx is the prevailing party in an action brought to enforce the terms of either of those contracts, then Blocker shall reimburse MiMedx attorney's fees costs incurred by MiMedx in the litigation.

204.    Breach of the Non-Competition Agreement and the Non-Solicitation Agreement by Blocker has caused MiMedx to incur costs and attorneys' fees to enforce its contractual rights thereunder. MiMedx is therefore entitled to recover its costs and reasonable attorneys' fees in this action.

## COUNT IX

### Attorneys' Fees and Expenses (Against All Defendants)

205.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 204 above.

206.    By their actions and conduct described herein, Defendants have acted in bad faith, have been stubbornly litigious, and have caused MiMedx unnecessary trouble and expense, entitling MiMedx to recover its costs and expenses of litigation, including attorney's fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT X

### Punitive Damages (Against All Defendants)

207.    MiMedx realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 206 above.

208.    Defendants' willful and knowing avoidance of duties created by Georgia statutory and common law as well as contractual language subjects Defendants to a claim for punitive damages pursuant to O.C.G.A. § 51-12-5.1, which permits punitive damages where the defendants' behavior depicted "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

209.    Defendants' intentional actions described above constituted willful misconduct.

210.    Defendants' continued violations, even in light of being informed of their illegality, demonstrate willful misconduct sufficient to entitle MiMedx to punitive damages.

211.   MiMedx is entitled to punitive damages in an amount the Court deems necessary to punish and deter Defendants from similar future conduct.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, MiMedx respectfully demands that judgment be made and entered in its favor and against the Defendants as follows:

A.   Award MiMedx actual and compensatory damages in an amount to be determined at trial.

B.   Award MiMedx punitive damages in an amount to be determined at trial.

C.   Enter a permanent injunction enjoining Defendants from further interfering with MiMedx's business relations.

D.   Enter a permanent injunction enjoining Defendants from further interfering with MiMedx's contractual relations.

E.   Enter a permanent injunction enjoining Blocker from further violating his Non-Competition Agreement and the Non-Solicitation Agreement.

F.   Enter a permanent injunction enjoining Defendants from further misappropriating MiMedx's trade secrets.

G.   Require Defendants to account for all revenues and profits derived from the use of MiMedx's proprietary or confidential business information, and interference with MiMedx's employees, customers, and/or business relationships.

H.   Award MiMedx all costs and attorneys' fees it incurs in the prosecution of this lawsuit, pursuant to O.C.G.A. § 13-6-11 and the terms of the Non-Competition Agreement and the Non-Solicitation Agreement.

I.      Grant such other and further relief as this Court in its judgment deems just

and appropriate.

Respectfully submitted this 24th day of May 2024.

ALSTON & BIRD LLP

By:   /s/ *Christopher C. Marquardt*
Christopher C. Marquardt
Georgia Bar No. 471150
Chris.Marquardt@alston.com
F. Nicholas Chandler
Georgia Bar No. 110451
Nick.Chandler@alston.com
Leigh Shapiro
Georgia Bar No. 408330
Leigh.Shapiro@alston.com
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone: (404) 881-7000
Fax: (404) 881-7777

*Attorneys for Plaintiff*
*MiMedx Group, Inc.*

# Exhibit 1

# NON-COMPETITION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Employee Acknowledgments

(a)     The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and other existing or future products developed, manufactured, marketed, authorized, offered or provided by the Company (the "Business").

(b)     The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c)     Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

(d)     In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

## 2 Non-Competition

During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory (as such term is defined below in Section 2 of this Agreement), either directly or indirectly, (i) engage in, coordinate, supervise, or manage sales, marketing, customer service, account management, or sales support for any business offering products or services competitive with those offered by the Company; (ii) provide the same or similar services, engage in the same or similar activities, or manage the same or similar services as those provided or engaged in by Employee for or on behalf of the Company within two (2) years prior to the Termination Date for any business offering products or services competitive with those offered by the Company; or (iii) serve in a general management capacity or engage in general management activities for any business offering products or services competitive with those offered by the Business.

For purposes of this Agreement, "Territory" means any state in which Employee performs services on behalf of the Company and any U.S. state in which a customer to which Employee provides services on behalf of the Company is located at any time during Employee's relationship with the Company. Employee agrees and acknowledges that as of the Effective Date, the Employee will be providing services on behalf of the Company in each of the U.S. states indicated below. The Employee further agrees and acknowledges that from time to time during the course of Employee's employment with the Company, Employee may begin to provide services in other U.S. states not indicated below in which a customer to which Employee provides services on behalf of the Company after the Effective Date, is located ("Additional States"). Upon the Employee's Termination Date, the combination of the states indicated below plus such Additional States shall form the Territory in which this Agreement is enforced. Such Additional States and the states indicated below will be limited to those in which the above-described services were provided by the Employee on behalf of the Company within two (2) years prior to the Termination Date.


Employee Initial

| | | | |
|---|---|---|---|
| ☐ Alabama | ☒ Indiana | ☒ Nebraska | ☐ Rhode Island |
| ☐ Alaska | ☒ Iowa | ☐ Nevada | ☐ South Carolina |
| ☐ Arizona | ☒ Kansas | ☐ New Hampshire | ☒ South Dakota |
| ☐ Arkansas | ☐ Kentucky | ☐ New Jersey | ☐ Tennessee |
| ☐ California | ☐ Louisiana | ☐ New Mexico | ☐ Texas |
| ☐ Colorado | ☐ Maine | ☐ New York | ☐ Utah |
| ☐ Connecticut | ☐ Maryland | ☐ North Carolina | ☐ Vermont |
| ☐ Delaware | ☐ Massachusetts | ☒ North Dakota | ☐ Virginia |
| ☐ Florida | ☒ Michigan | ☒ Ohio | ☐ Washington |
| ☐ Georgia | ☒ Minnesota | ☐ Oklahoma | ☐ West Virginia |
| ☐ Hawaii | ☐ Mississippi | ☐ Oregon | ☒ Wisconsin |
| ☐ Idaho | ☒ Missouri | ☐ Pennsylvania | ☐ Wyoming |
| ☒ Illinois | ☐ Montana | | ☐ District of Columbia |

## 3. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

## 4. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

## 5. Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

## 6. Tolling

In the event the enforceability of any of the terms of this Agreement shall be challenged in a court of competent jurisdiction and Employee is not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the lawsuit challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

## 7. Reasonableness of Restrictions

Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

## 8. Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

_SLB_
_____ Employee Initial

**9  Entire Agreement and Modification**

This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

**10  Governing Law; Jurisdiction; Venue**

This Agreement has been entered into under and shall be governed by the laws of the State of Georgia.  The parties agree that the state and federal courts located in Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement.  Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship.  Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

**11. Employee's Status**

Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will".  No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

**12. Future Employment**

For so long as the restricted period in Section 2 of this Agreement remains in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement.  For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

**13  Prevailing Party**

If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

The parties hereto have duly executed this Agreement on the date identified below.

Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___12___ day of ___December___, 20_17_.
　　　　　　　　(day)　　　　　　(month)　　　　(year)

MiMedx Group, Inc.

_____
Stephen L. Blosser

_____
By: Thornton A. Kuntz, Jr.
　　Senior Vice President, Administration

Employee Initial

Page 3 of 3

# Exhibit 2

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1.   Definitions.

   (a)   "Business" means the business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and (v other current or future products developed, manufactured or marketed by the Company.

   (b)   "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

   (c)   "Material Contact" means the contact between Employee and each Customer or potential Customer of the Company: (i) with whom or with which Employee dealt on behalf of the Company in an effort to initiate, maintain or further a business relationship between the Company and the Customer or potential Customer; (ii) whose dealings with the Company were coordinated or supervised by Employee; (iii) about whom Employee obtained confidential information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within the last two (2) years of Employee's employment with the Company.

   (d)   "Confidential Information" means (i) all non-public information in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems concerning the Company, its parent and the other subsidiaries of its parent relating to their respective businesses, operations, personnel, properties or finances which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time in connection with Employee's employment with the Company; (ii) all tangible reproductions or embodiments of the information described in (i); (iii) all notes, analyses, compilations, studies, interpretations or other documents, and all copies thereof, prepared by Employee, which contain, reflect or are based upon, in whole or in part, any of the information described in (i). Confidential Information includes, but is not limited to, data, reports (including, but not limited to, weekly task list reports and clinical research reports), analyses (including, but not limited to, analyses of competitive products and potentially competitive emerging technologies), matrices, notes, interpretations, protocols, forecasts, testing, methods and analysis of test results, records, models (including, but not limited to, the models of studies performed), documents, agreements,  business plans, budgeting information, customer lists, the identity of and information relating to suppliers, business partnerships and acquisition targets, financial statements and other financial information of the Company and its customers or suppliers, know-how, strategic or technical data, research (primary and basic), clinical trial data and outcomes, technology (including without limitation all processing, manufacturing and related technology), designs, developments, inventions, data and any components thereof, whether or not copyrightable, intellectual property and trade secrets, whether or not patented or patentable, patent programs and strategies, sales and marketing data, marketing research data, marketing strategies, marketing materials (including, those in draft form), product information (including, but not limited to, the composition and structure of products, manufacturing processes for products, histology of products, biologic activity of products, internal opinions on the efficacy of products, and research team conclusions on products), product research and development data, sample product information, information discussed during lab meetings, software programs (including source code), pricing information and strategies, information provided by third parties which the Company has a duty to protect from disclosure.

   The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to Employee being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (d) is explicitly approved for release by written authorization of the Company.

   (e)   "Trade Secrets" means Confidential Information which meets the additional requirements of the Georgia Trade Secrets Act of 1990 (the "Act") or similar state law, as applicable, or the Defend Trade Secrets Act of 2016.

2.   Employment.

   (a)   Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. While Employee is employed by the Company, Employee: (i) owes a duty of good faith and loyalty to the Company, (ii) shall devote Employee's full business time, energy and skill to the Business, and (iii) shall not: (A) become associated with or affiliated with any other business or entity which is the same as or essentially the same as the Business, (B) prepare or otherwise make arrangements to compete with the Business, and (C) sell other products, whether or not competitive, to customers who do or could purchase our products while employed.

   (b)   Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property, confidential information or trade secrets belonging to any prior or existing employer for use on behalf of Company, including, but not limited to, originals or copies of any contracts, agreements,

 Employee initial

financial books, records, client lists, memoranda, data, reports, programs, software, tapes, contact lists (including, but not limited to, those in Outlook or other electronic databases, including smartphones), letters, research, listings, programming or any other instruments, records or documents belonging to any former employer. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

(c) Prior to the end of his employment with all former employers, Employee did not solicit any clients or take any other action in violation of any former employer agreement or in violation of any other legal or contractual duty owed to any former employer, including any fiduciary duty or duty of loyalty to any former employer. For so long as Employee is an employee of Company, and bound by any term, provision or covenant of any former employer agreement, Employee will (i) abide by every term, provision and covenant of all such former employer agreements, (ii) take no action that would result in a breach of a representation or warranty under any former employer agreement, and (iii) take no action that would result in Company being liable to any former employer of Employee for any reason.

(d) Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will". No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

3. <u>Duty of Confidentiality and Use Restrictions Relating to Confidential Information.</u>

(a) Employee shall (i) hold all Confidential Information in trust and confidence and not, directly or indirectly, divulge, publish or disclose the Confidential Information, whether it is tangible or intangible, to (A) any third party, or (B) any employee or contractor of the Company not authorized to access the Confidential Information, without prior written consent of the Company; (ii) not copy or remove from the Company offices any Confidential Information or Trade Secrets without prior written consent of the Company; and (iii) not use the Confidential Information for Employee's personal benefit or for the benefit of any third party, except as otherwise required pursuant to valid judicial order, provided Employee shall provide prompt written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee's obligations under this Section 3 as it relates to Confidential Information that is a trade secret under the Act shall apply as long as the Confidential Information remains a trade secret under the Act, and Employee's obligations under this Section 3 as it relates to Confidential Information that does not constitute trade secrets under the Act shall apply for three (3) years or as long as the Confidential Information remains confidential, whichever is shorter.

(b) Notwithstanding anything herein to the contrary, the term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (ii) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (iii) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (iv) is independently developed by Employee without the aid, application or use of the Confidential Information; or (v) is explicitly approved for release by written authorization of the Company.

(c) Notwithstanding Employee's obligations under this Section 3 not to disclose Confidential Information, nothing in this Agreement prohibits Employee from disclosing information in confidence to a government official or to an attorney for the sole purpose of reporting or investigating a suspected violation of the law. Similarly, nothing in this Agreement prohibits Employee from disclosing information in a complaint or other court filing, if and only if such filing is made under seal.

4. <u>Company Property and Information.</u>  Employee agrees and acknowledges that all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment, vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices are the sole and exclusive property and information of the Company and that the Company has not conveyed any ownership interest in any such items to Employee. Employee agrees to return all of the Company's property and information (i) within three (3) days following the end of Employee's employment with the Company for any reason, or (ii) immediately upon the Company's written request to Employee. To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5. <u>Non-Solicitation Covenant.</u>  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business from any of the Customers or actively sought potential Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company, for purposes of providing any products or services competitive with those provided by the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment

 Employee Initial

of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company.

6. **Non-Recruitment of Company Employees**   While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent for the purpose of encouraging, enticing, or causing the employee to terminate employment with the Company, or hire or engage the services of such employee, to provide products or services that are competitive with those provided by the Company.

7. **Reasonableness of Restrictions**   Employee agrees and acknowledges that the restraints imposed upon Employee under Sections 5 and 6: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business,

8. **Employee Acknowledgments**

   (a)   Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, (v) human allograft including skin and bone graft products, and (vi) other existing or future products developed, manufactured or marketed by the Company (the "Business").
   (b)   The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.
   (c)   Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

9. **Choice of Law and Forum Selection.**   All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County Georgia. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

10. **Construction of Agreement.**   The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement. In the event a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

11. **Successors**   This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

12. **Entire Agreement and Modification.**   This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

13. **Injunctive Relief.**   Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in or covering Cobb County Georgia enjoining said breach or threatened breach. The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

14. **Prevailing Party**   If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

_____ Employee initial

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this __29__ day of ____12____, __2017__
        *(day)*           *(month)*     *(year)*

_____
Stephen L. Blocker

MiMedx Group, Inc.

_____
By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration

_____ Employee initial

Page 4 of 4

# Exhibit 3



November 29, 2023

**VIA:  Federal Express and Email** (abel.bullock@surgenex.com)

Mr. Abel Bullock
CEO
Surgenex LLC
15444 N 76th St; Suite 110
Scottsdale, AZ 85260

       Re:    *Employees' Continuing Contractual Obligations to MiMedx Group, Inc.*

Dear Mr. Bullock:

It has come to the attention of MiMedx Group, Inc. ("MiMedx" or the "Company") that its former employees, Joe Panther and Brooke Whipple, are currently employed by Surgenex.  As I am sure you are now aware, both employees have continuing contractual obligations to MiMedx, including non-competition, confidentiality, customer non-solicitation, and employee non-recruitment obligations.  While we have received assurances from their counsel that Mr. Panther and Ms. Whipple are not currently in violation of these obligations, including their non-competition obligations by either not performing similar services and/or by working outside of their defined restricted territories, MiMedx will continue to monitor their compliance and trusts that Surgenex will ensure no future violations occur.

In addition, Surgenex currently employs other former MiMedx employees.  While many of the contractual obligations these employees were subject to have since expired, their obligation to maintain the confidentiality of MiMedx trade secrets remains.  Again, MiMedx trusts that Surgenex will ensure these former employees honor these obligations as MiMedx takes the protection of its trade secrets very seriously and will pursue all necessary actions to preserve their integrity.

Further, MiMedx believes that Surgenex is specifically targeting MiMedx employees, especially Account Executives and other sales personnel, for employment at Surgenex.  MiMedx hereby puts Surgenex on notice that its personnel are subject to various continuing contractual obligations to protect MiMedx's legitimate business interests, including confidentiality and, to the extent not prohibited by applicable state laws, non-competition, non-solicitation, and non-recruitment.  Please note that MiMedx will vigorously enforce these contractual obligations to the fullest extent of the law and will consider all necessary legal actions to protect its legitimate business interests.

Lastly, MiMedx has reason to suspect that Surgenex may be using and incentivizing current MiMedx employees to recruit their fellow employees to join Surgenex. Such conduct is highly inappropriate and would put these current employees in breach of their legal and contractual duties to MiMedx. To the extent Surgenex and these current employees are engaged in such troubling and violative behavior, MiMedx will have no choice but to pursue all possible legal remedies.

If you have any questions, I can be reached at bhulse@mimedx.com.

Regards,

*William "Butch" Hulse*

William "Butch" Hulse
General Counsel and
Chief Administrative Officer

# Exhibit 4

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

**Christopher C. Marquardt**                    Direct Dial: **+1 404 881 7827**                    Email: **chris.marquardt@alston.com**

May 20, 2024

VIA UPS NEXT-DAY AIR DELIVERY & E-MAIL

Mr. Steve Blocker
908 N Winchester Avenue
Chicago, Illinois 60622
sblocker11@yahoo.com

Re:      *Your Violations of Law With Respect to MiMedx*

Dear Mr. Blocker:

The law firm of Alston & Bird LLP represents your former employer, MiMedx Group, Inc. ("MiMedx").  Our client has directed us to inform you that MiMedx will be asserting legal claims against you in the near future based on unfair competition, breaches of contract, and related claims. If you are represented by legal counsel, please direct this letter to their attention.

Immediately upon your receipt of this notice, you have a legal obligation to preserve any and all evidence that may be relevant to an imminent legal dispute with MiMedx. Wiping hard drives, destroying computer equipment, deleting text messages and direct messages, and doing anything else to prevent MiMedx from gaining access to your written and electronic communications over the past many months may result in severe legal consequences and sanctions. That means, among other things, that **you must take immediate steps to permanently save** all email messages, text messages, instant messaging, social media posts, cell phone records, photos, electronic files, paper records, and any other documents and things that relate to: (1) your employment with and resignation from MiMedx; (2) your communications with representatives of Surgenex LLC ("Surgenex") about joining that firm; (3) your communications with current and former MiMedx employees regarding Surgenex and their departure from MiMedx; (4) your communications with current and former MiMedx sales agents regarding Surgenex and their departure from MiMedx; (5) your employment at Surgenex; (6) your communications with MiMedx clients about your move from MiMedx to Surgenex, and/or their potential moves to Surgenex; and (7) any other related topics regarding Surgenex and MiMedx.

Alston & Bird LLP                                                                                                                www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Fort Worth | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

Mr. Steve Blocker
May 20, 2024
Page 2

Without limiting your preservation duties, **you must take immediate steps to turn off any autodelete functions** on your phones or other electronic devices that might otherwise result in the destruction of relevant evidence.  Any failure to take adequate steps to preserve relevant information (whether it is claimed to be "accidental," or not), and any destruction of information in your possession, will be met with requests for appropriate sanctions during any prosecution of MiMedx's claims against you.

We understand that you have violated multiple provisions in the Non-Competition Agreement executed on December 12, 2017, and the Confidentiality and Non-Solicitation Agreement executed on December 29, 2017 (collectively, the "Agreements") that you entered into with MiMedx.  For your convenience, I am enclosing a copy of the Agreements with this letter as Exhibits A and B.

In the Non-Competition Agreement, you agreed that, within the restricted territory during your employment with MiMedx and for a one-year period following the end of your employment, you would not engage in the same or similar services or activities as those you performed at MiMedx.  *See* Exh. A at ¶ 2.  In the Confidentiality and Non-Solicitation Agreement you agreed that, during your employment with MiMedx and for one year following the end of your employment, you would not solicit or attempt to solicit any business from MiMedx's customer or actively sought potential customers.  *See* Exh. B at ¶ 5.  You also agreed that, during your employment with MiMedx and for one year following the end of your employment, you would not solicit or attempt to solicit any MiMedx employees for the purpose of "encouraging, enticing, or causing" the employees to terminate employment with MiMedx. *See* Exh. B at ¶ 6.  In the Confidentiality and Non-Solicitation Agreement you further agreed that you would not disclose MiMedx's confidential information or retain any of MiMedx's documents, data, or other material.  *See* Exh. B at ¶¶ 3-4.

Your employment with Surgenex directly violates the Non-Competition Agreement.  Any attempt by you to recruit or encourage current MiMedx employees or customers to Surgenex or any use of MiMedx's confidential, proprietary, or trade secret information other than during your work for MiMedx would also constitute a direct violation of the Confidentiality and Non-Solicitation Agreement.

MiMedx is aware that at or around the same time as your departure this month, additional MiMedx employees who worked on your team and/or who have a relationship with you have also resigned their employment at MiMedx and commenced employment with Surgenex.  MiMedx also understands that you have been contacting MiMedx's sales agents regarding Surgenex and their departure from MiMedx. MiMedx believes that you have taken actions that violate your contractual obligations to MiMedx by soliciting, inducing, and/or encouraging then-current MiMedx employees to leave their employment at MiMedx and join you at Surgenex.  In addition, MiMedx believes that, during your employment with MiMedx, you made multiple intentional misrepresentation to counsel regarding your knowledge and actions with respect to Surgenex and the situation described in this letter.

Mr. Steve Blocker
May 20, 2024
Page 3

MiMedx's investigation into your actions has already begun, and our client is confident that the facts that have been discovered to date, combined with additional facts that will be obtained through formal discovery, will allow it to prevail on multiple claims against you and Surgenex.

The claims that MiMedx intends to assert against you are not limited to breach of contract claims. The company is also investigating claims arising from your breaches of common law and fiduciary duties, tortious conduct, and claims tied to violations of federal and state statutes. This is a serious matter that will require you and Surgenex to respond to formal requests for information during the discovery period of all related lawsuits. For that reason, you must take steps today to preserve all relevant electronic files, documents, and information. Upon the commencement of a legal action, MiMedx will serve necessary subpoenas and legal papers to obtain relevant information regarding your recent communications and activities leading up to your resignation from MiMedx and your subsequent actions.

This is a serious matter that should be taken very seriously. MiMedx hereby demands that you **cease and desist** from any and all actions that constitute unfair competition, misuse of confidential information, breaches of contractual duties, and interference with contract rights. MiMedx also demands the immediate return of any and all MiMedx property (including phones and computers) and any and all information about MiMedx's business and clients that remains in your possession or on your electronic devices.

Our client stands ready to pursue legal action as it deems necessary to defend its rights. If your counsel would like to discuss this matter in more detail, please have them contact me.

Sincerely,

Christopher C. Marquardt

Enclosures

cc: William "Butch" Hulse (via email with enclosures)

# EXHIBIT A

# NON-COMPETITION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Employee Acknowledgments

(a)     The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and other existing or future products developed, manufactured, marketed, authorized, offered or provided by the Company (the "Business").

(b)     The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c)     Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

(d)     In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

## 2 Non-Competition

During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory (as such term is defined below in Section 2 of this Agreement), either directly or indirectly, (i)  engage in, coordinate, supervise, or manage sales, marketing, customer service, account management, or sales support for any business offering products or services competitive with those offered by the Company; (ii) provide the same or similar services, engage in the same or similar activities, or manage the same or similar services as those provided or engaged in by Employee for or on behalf of the Company within two (2) years prior to the Termination Date for any business offering products or services competitive with those offered by the Company; or (iii)  serve in a general management capacity or engage in general management activities for any business offering products or services competitive with those offered by the Business.

For purposes of this Agreement, "Territory" means any state in which Employee performs services on behalf of the Company and any U.S. state in which a customer to whom Employee provides services on behalf of the Company is located at any time during Employee's relationship with the Company.  Employee agrees and acknowledges that as of the Effective Date, the Employee will be providing services on behalf of the Company in each of the U.S. states indicated below.  The Employee further agrees and acknowledges that from time to time during the course of Employee's employment with the Company, Employee may begin to provide services in other U.S. states not indicated below in which a customer to which Employee provides services on behalf of the Company after the Effective Date, is located ("Additional States"). Upon the Employee's Termination Date, the combination of the states indicated below plus such Additional States shall form the Territory in which this Agreement is enforced. Such Additional States and the states indicated below will be limited to those in which the above-described services were provided by the Employee on behalf of the Company within two (2) years prior to the Termination Date.


Employee Initial

| | | | |
|---|---|---|---|
| ☐ Alabama | ☒ Indiana | ☒ Nebraska | ☐ Rhode Island |
| ☐ Alaska | ☒ Iowa | ☐ Nevada | ☐ South Carolina |
| ☐ Arizona | ☒ Kansas | ☐ New Hampshire | ☒ South Dakota |
| ☐ Arkansas | ☐ Kentucky | ☐ New Jersey | ☐ Tennessee |
| ☐ California | ☐ Louisiana | ☐ New Mexico | ☐ Texas |
| ☐ Colorado | ☐ Maine | ☐ New York | ☐ Utah |
| ☐ Connecticut | ☐ Maryland | ☐ North Carolina | ☐ Vermont |
| ☐ Delaware | ☐ Massachusetts | ☒ North Dakota | ☐ Virginia |
| ☐ Florida | ☒ Michigan | ☒ Ohio | ☐ Washington |
| ☐ Georgia | ☒ Minnesota | ☐ Oklahoma | ☐ West Virginia |
| ☐ Hawaii | ☐ Mississippi | ☐ Oregon | ☒ Wisconsin |
| ☐ Idaho | ☒ Missouri | ☐ Pennsylvania | ☐ Wyoming |
| ☒ Illinois | ☐ Montana | | ☐ District of Columbia |

### 3. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

### 4. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

### 5 Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

### 6. Tolling

In the event the enforceability of any of the terms of this Agreement shall be challenged in a court of competent jurisdiction and Employee is not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the lawsuit challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

### 7. Reasonableness of Restrictions

Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

### 8 Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.



_____Employee Initial

**9  Entire Agreement and Modification**

This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

**10  Governing Law; Jurisdiction; Venue**

This Agreement has been entered into under and shall be governed by the laws of the State of Georgia. The parties agree that the state and federal courts located in Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement. Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship. Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

**11. Employee's Status**

Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will". No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

**12. Future Employment**

For so long as the restricted period in Section 2 of this Agreement remains in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement. For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

**13  Prevailing Party**

If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

The parties hereto have duly executed this Agreement on the date identified below.

Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this _____12_____ day of ____December____, 20 _17_.
      (day)          (month)     (year)

MiMedx Group, Inc.

_____          _____
Stephen L. Blosier                                              By: Thornton A. Kuntz, Jr.
                                                                            Senior Vice President, Administration

_____Employee Initial

# EXHIBIT B

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1. <u>Definitions.</u>

   (a) "Business" means the business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and (v other current or future products developed, manufactured or marketed by the Company.

   (b) "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

   (c) "Material Contact" means the contact between Employee and each Customer or potential Customer of the Company: (i) with whom or with which Employee dealt on behalf of the Company in an effort to initiate, maintain or further a business relationship between the Company and the Customer or potential Customer; (ii) whose dealings with the Company were coordinated or supervised by Employee; (iii) about whom Employee obtained confidential information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within the last two (2) years of Employee's employment with the Company.

   (d) "<u>Confidential Information</u>" means (i) all non-public information in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems concerning the Company, its parent and the other subsidiaries of its parent relating to their respective businesses, operations, personnel, properties or finances which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time in connection with Employee's employment with the Company; (ii) all tangible reproductions or embodiments of the information described in (i); (iii) all notes, analyses, compilations, studies, interpretations or other documents, and all copies thereof, prepared by Employee, which contain, reflect or are based upon, in whole or in part, any of the information described in (i). Confidential Information includes, but is not limited to, data, reports (including, but not limited to, weekly task list reports and clinical research reports), analyses (including, but not limited to, analyses of competitive products and potentially competitive emerging technologies), matrices, notes, interpretations, protocols, forecasts, testing, methods and analysis of test results, records, models (including, but not limited to, the models of studies performed), documents, agreements, business plans, budgeting information, customer lists, the identity of and information relating to suppliers, business partnerships and acquisition targets, financial statements and other financial information of the Company and its customers or suppliers, know-how, strategic or technical data, research (primary and basic), clinical trial data and outcomes, technology (including without limitation all processing, manufacturing and related technology), designs, developments, inventions, data and any components thereof, whether or not copyrightable, intellectual property and trade secrets, whether or not patented or patentable, patent programs and strategies, sales and marketing data, marketing research data, marketing strategies, marketing materials (including, those in draft form), product information (including, but not limited to, the composition and structure of products, manufacturing processes for products, histology of products, biologic activity of products, internal opinions on the efficacy of products, and research team conclusions on products), product research and development data, sample product information, information discussed during lab meetings, software programs (including source code), pricing information and strategies, information provided by third parties which the Company has a duty to protect from disclosure.

   The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to Employee being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (d) is explicitly approved for release by written authorization of the Company.

   (e) "Trade Secrets" means Confidential Information which meets the additional requirements of the Georgia Trade Secrets Act of 1990 (the "Act") or similar state law, as applicable, or the Defend Trade Secrets Act of 2016.

2. <u>Employment.</u>

   (a) Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. While Employee is employed by the Company, Employee: (i) owes a duty of good faith and loyalty to the Company, (ii) shall devote Employee's full business time, energy and skill to the Business, and (iii) shall not: (A) become associated with or affiliated with any other business or entity which is the same as or essentially the same as the Business, (B) prepare or otherwise make arrangements to compete with the Business, and (C) sell other products, whether or not competitive, to customers who do or could purchase our products while employed.

   (b) Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property, confidential information or trade secrets belonging to any prior or existing employer for use on behalf of Company, including, but not limited to, originals or copies of any contracts, agreements,

 Employee initial

financial books, records, client lists, memoranda, data, reports, programs, software, tapes, contact lists (including, but not limited to, those in Outlook or other electronic databases, including smartphones), letters, research, listings, programming or any other instruments, records or documents belonging to any former employer.  Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

(c)  Prior to the end of his employment with all former employers, Employee did not solicit any clients or take any other action in violation of any former employer agreement or in violation of any other legal or contractual duty owed to any former employer, including any fiduciary duty or duty of loyalty to any former employer.  For so long as Employee is an employee of Company, and bound by any term, provision or covenant of any former employer agreement, Employee will (i) abide by every term, provision and covenant of all such former employer agreements, (ii) take no action that would result in a breach of a representation or warranty under any former employer agreement, and (iii) take no action that would result in Company being liable to any former employer of Employee for any reason.

(d)  Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will".  No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

3.   <u>Duty of Confidentiality and Use Restrictions Relating to Confidential Information.</u>

(a)  Employee shall (i) hold all Confidential Information in trust and confidence and not, directly or indirectly, divulge, publish or disclose the Confidential Information, whether it is tangible or intangible, to (A) any third party, or (B) any employee or contractor of the Company not authorized to access the Confidential Information, without prior written consent of the Company; (ii) not copy  or remove from the Company offices any Confidential Information or Trade Secrets without prior written consent of the Company; and (iii) not use the Confidential Information for Employee's personal benefit or for the benefit of any third party, except as otherwise required pursuant to valid judicial order, provided Employee shall provide prompt written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee's obligations under this Section 3 as it relates to Confidential Information that is a trade secret under the Act shall apply as long as the Confidential Information remains a trade secret under the Act, and Employee's obligations under this Section 3 as it relates to Confidential Information that does not constitute trade secrets under the Act shall apply for three (3) years or as long as the Confidential Information remains confidential, whichever is shorter.

(b)  Notwithstanding anything herein to the contrary, the term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (ii) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (iii) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (iv) is independently developed by Employee without the aid, application or use of the Confidential Information; or (v) is explicitly approved for release by written authorization of the Company.

(c)  Notwithstanding Employee's obligations under this Section 3 not to disclose Confidential Information, nothing in this Agreement prohibits Employee from disclosing information in confidence to a government official or to an attorney for the sole purpose of reporting or investigating a suspected violation of the law.  Similarly, nothing in this Agreement prohibits Employee from disclosing information in a complaint or other court filing, if and only if such filing is made under seal.

4.   <u>Company Property and Information.</u>  Employee agrees and acknowledges that all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices are the sole and exclusive property and information of the Company and that the Company has not conveyed any ownership interest in any such items to Employee. Employee agrees to return all of the Company's property and information (i) within three (3) days following the end of Employee's employment with the Company for any reason, or (ii) immediately upon the Company's written request to Employee.  To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5.   <u>Non-Solicitation Covenant.</u>  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business from any of the Customers or actively sought potential Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company, for purposes of providing any products or services competitive with those provided by the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests,  and to protect and retain (and to prevent Employee from unfairly and to the detriment

 **Employee initial**

of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company.

6. <u>Non-Recruitment of Company Employees</u>   While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent for the purpose of encouraging, enticing, or causing the employee to terminate employment with the Company, or hire or engage the services of such employee, to provide products or services that are competitive with those provided by the Company.

7. <u>Reasonableness of Restrictions</u>   Employee agrees and acknowledges that the restraints imposed upon Employee under Sections 5 and 6: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business,

8. <u>Employee Acknowledgments</u>

   (a)   Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, (v) human allograft including skin and bone graft products, and (vi) other existing or future products developed, manufactured or marketed by the Company (the "Business").
   (b)   The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.
   (c)   Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

9. <u>Choice of Law and Forum Selection.</u>   All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County Georgia. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

10. <u>Construction of Agreement.</u>   The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement. In the event a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

11. <u>Successors</u>   This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

12. <u>Entire Agreement and Modification.</u>   This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

13. <u>Injunctive Relief.</u>   Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in or covering Cobb County Georgia enjoining said breach or threatened breach. The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

14. <u>Prevailing Party</u>   If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

_____ Employee initial

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this __29__ day of ____12____, __2017__
               *(day)*            *(month)*      *(year)*


_____
Stephen L. Blocker

MiMedx Group, Inc.

_____
By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration


_____ Employee Initial

Page 4 of 4

# Exhibit 5

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

**Christopher C. Marquardt**          Direct Dial: **+1 404 881 7827**          Email: **chris.marquardt@alston.com**

May 20, 2024

VIA UPS NEXT-DAY AIR DELIVERY & E-MAIL

Mr. Abel Bullock
Chief Executive Officer
Surgenex, LLC
15444 N 76th Street, Suite 110
Scottsdale, AZ 85260
abel.bullock@surgenex.com

Re:      *Your Company's Violations of Law With Respect to MiMedx*

Dear Mr. Bullock:

The law firm of Alston & Bird LLP represents MiMedx Group, Inc. ("MiMedx"). Our client has directed us to inform you that MiMedx will be asserting legal claims against Surgenex, LLC ("Surgenex") in the near future based on unfair competition and related claims. Please direct this letter to Surgenex's General Counsel and/or outside counsel.

Upon your receipt of this notice, Surgenex has a legal obligation to preserve any and all evidence that may be relevant to an imminent legal dispute with MiMedx. Wiping hard drives, destroying computer equipment, deleting text messages and direct messages, and doing anything else to prevent MiMedx from gaining access to Surgenex's written and electronic communications over the past many months may result in severe legal consequences and sanctions. That means, among other things, that **Surgenex must take immediate steps to permanently save** all email messages, text messages, instant messaging, social media posts, cell phone records, photos, electronic files, paper records, and any other documents and things that relate to: (1) your communications with current and former employees of MiMedx; (2) your communications with current and former MiMedx sales agents; (3) your communications with clients and customers of MiMedx; (4) Surgenex's use of the Average Sales Price method to calculate reimbursements sought from the Centers for Medicare & Medicaid Services for Surgenex products, and corresponding commissions paid to Surgenex sales representatives; and (5) any other related topics regarding MiMedx.

Alston & Bird LLP                                                                                          www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Fort Worth | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

LEGAL02/44405146v1

Mr. Abel Bullock
May 20, 2024
Page 2

Without limiting your preservation duties, **Surgenex must take immediate steps to turn off any autodelete functions** on employee's phones or other electronic devices that might otherwise result in the destruction of relevant evidence.  Any failure to take adequate steps to preserve relevant information (whether it is claimed to be "accidental," or not), and any destruction of information in your possession, will be met with requests for appropriate sanctions during any prosecution of MiMedx's claims against Surgenex.

MiMedx understands that Surgenex has conspired with persons who were then-employed by MiMedx to solicit and hire multiple MiMedx employees over the last several months (collectively, the "Former MiMedx Employees").  MiMedx understands that Surgenex is aware that each of these employees has executed a Non-Competition Agreement and Confidentiality and Non-Solicitation Agreement with MiMedx (the "Agreements").  As an example, we enclose here a copy of the Agreements with Steve Blocker as Exhibits A and B to this letter.

In the Non-Competition Agreement, Mr. Blocker agreed that, within the restricted territory during his employment with MiMedx and for a one-year period following the end of his employment, he would not engage in the same or similar services or activities as those he performed at MiMedx.  *See* Exh. A at ¶ 2.  In the Confidentiality and Non-Solicitation Agreement Mr. Blocker agreed that, during his employment with MiMedx and for one year following the end of his employment, he would not solicit or attempt to solicit any business from MiMedx's customer or actively sought potential customers.  *See* Exh. B at ¶ 5.  He also agreed that, during his employment with MiMedx and for one year following the end of his employment, Mr. Blocker would not solicit or attempt to solicit any MiMedx employees for the purpose of "encouraging, enticing, or causing" the employees to terminate employment with MiMedx.  *See* Exh. B at ¶ 6.  In the Confidentiality and Non-Solicitation Agreement Mr. Blocker further agreed that he would not disclose MiMedx's Confidential Information or retain any of MiMedx's documents, data, or other material.  *See* Exh. B at ¶¶ 3-4.

The Former MiMedx Employees' employment with Surgenex directly violates their Non-Competition Agreements.  In addition, any attempt by the Former MiMedx Employees to recruit or encourage current MiMedx employees or customers to leave MiMedx for Surgenex, or any use of MiMedx's confidential, proprietary, or trade secret information other than during your work for MiMedx would constitute a direct violation of their Confidentiality and Non-Solicitation Agreements.

Separate and apart from their ongoing contractual obligations, each Former MiMedx Employee has owed common law duties of loyalty and fiduciary duties, as well as statutory duties under federal and state law. MiMedx therefore believes that the potential violations of law by Surgenex and the Former MiMedx Employee extend far beyond the language in the employment agreements that have been violated.

MiMedx is aware that Surgenex has engaged in a months-long campaign to improperly lure away MiMedx's sales force and thereby gain access to MiMedx's

Mr. Abel Bullock
May 20, 2024
Page 3

confidential business information, trade secrets, clients, and customers. MiMedx believes that Surgenex has taken actions that constitute business torts and that have aided and abetted the Former MiMedx Employees' breaches of duties and contractual obligations to MiMedx.  Upon information and belief, Surgenex also instructed its counsel to meet with MiMedx employees while they were still employed by MiMedx regarding Surgenex's strategy to improperly recruit these employees.  We find this conduct disturbing and, at a minimum, it gives rise to an obligation for Surgenex's counsel to also immediately take steps to permanently save all documents and information as described in the second paragraph of this letter.

MiMedx's investigation into Surgenex's actions has already begun, and our client is confident that the facts that have been discovered to date, combined with additional facts that will be obtained through formal discovery, will allow it to prevail on multiple claims against Surgenex and the Former MiMedx Employees.

Upon the commencement of a legal action, MiMedx will serve necessary subpoenas and legal papers to obtain relevant information regarding the Former MiMedx Employees' recent communications and activities leading up to their resignation from MiMedx and actions in concert with Surgenex. Our client is confident that the facts will establish violations of business tort laws and obligations under the Former MiMedx Employees' covenants agreements and other governing law.

This is a serious matter that should be taken very seriously. MiMedx hereby demands that Surgenex **cease and desist** from any and all actions that constitute unfair competition, tortious conduct, misuse of confidential information, breaches of contractual duties, interference with contract rights, and improper recruitment of MiMedx employees. Specifically, MiMedx demands that Surgenex provide assurances by **5:00 pm ET on Wednesday, May 22** of its receipt of this letter of any and all steps taken to ensure that the Former MiMedx Employees comply with and honor the post-employment restrictions set forth in their Agreements with MiMedx.  MiMedx also demands the immediate return of any and all information about MiMedx's business and clients that are in the possession of Surgenex or on the electronic devices of the Former MiMedx Employees now employed by Surgenex.

Our client stands ready to pursue legal action as it deems necessary to defend its rights. If your counsel would like to discuss this matter in more detail, please have them contact me.

Mr. Abel Bullock
May 20, 2024
Page 4

Sincerely,

Christopher C. Marquardt

Enclosures

cc: William "Butch" Hulse (via email with enclosures)

# EXHIBIT A

# NON-COMPETITION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Employee Acknowledgments

(a)    The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and other existing or future products developed, manufactured, marketed, authorized, offered or provided by the Company (the "Business").

(b)    The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c)    Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

(d)    In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

## 2 Non-Competition

During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory (as such term is defined below in Section 2 of this Agreement), either directly or indirectly, (i)  engage in, coordinate, supervise, or manage sales, marketing, customer service, account management, or sales support for any business offering products or services competitive with those offered by the Company; (ii) provide the same or similar services, engage in the same or similar activities, or manage the same or similar services as those provided or engaged in by Employee for or on behalf of the Company within two (2) years prior to the Termination Date for any business offering products or services competitive with those offered by the Company; or (iii)  serve in a general management capacity or engage in general management activities for any business offering products or services competitive with those offered by the Business.

For purposes of this Agreement, "Territory" means any state in which Employee performs services on behalf of the Company and any U.S. state in which a customer to which Employee provides services on behalf of the Company is located at any time during Employee's relationship with the Company.  Employee agrees and acknowledges that as of the Effective Date, the Employee will be providing services on behalf of the Company in each of the U.S. states indicated below.  The Employee further agrees and acknowledges that from time to time during the course of Employee's employment with the Company, Employee may begin to provide services in other U.S. states not indicated below in which a customer to which Employee provides services on behalf of the Company after the Effective Date, is located ("Additional States"). Upon the Employee's Termination Date, the combination of the states indicated below plus such Additional States shall form the Territory in which this Agreement is enforced. Such Additional States and the states indicated below will be limited to those in which the above-described services were provided by the Employee on behalf of the Company within two (2) years prior to the Termination Date.


Employee Initial

- ☐ Alabama
- ☐ Alaska
- ☐ Arizona
- ☐ Arkansas
- ☐ California
- ☐ Colorado
- ☐ Connecticut
- ☐ Delaware
- ☐ Florida
- ☐ Georgia
- ☐ Hawaii
- ☐ Idaho
- ☒ Illinois

- ☒ Indiana
- ☒ Iowa
- ☒ Kansas
- ☐ Kentucky
- ☐ Louisiana
- ☐ Maine
- ☐ Maryland
- ☐ Massachusetts
- ☒ Michigan
- ☒ Minnesota
- ☐ Mississippi
- ☒ Missouri
- ☐ Montana

- ☒ Nebraska
- ☐ Nevada
- ☐ New Hampshire
- ☐ New Jersey
- ☐ New Mexico
- ☐ New York
- ☐ North Carolina
- ☒ North Dakota
- ☒ Ohio
- ☐ Oklahoma
- ☐ Oregon
- ☐ Pennsylvania

- ☐ Rhode Island
- ☐ South Carolina
- ☒ South Dakota
- ☐ Tennessee
- ☐ Texas
- ☐ Utah
- ☐ Vermont
- ☐ Virginia
- ☐ Washington
- ☐ West Virginia
- ☒ Wisconsin
- ☐ Wyoming
- ☐ District of Columbia

### 3. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

### 4. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

### 5 Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

### 6. Tolling

In the event the enforceability of any of the terms of this Agreement shall be challenged in a court of competent jurisdiction and Employee is not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the lawsuit challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

### 7. Reasonableness of Restrictions

Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

### 8 Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

_SLB_
___ Employee Initial

**9  Entire Agreement and Modification**

This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

**10  Governing Law; Jurisdiction; Venue**

This Agreement has been entered into under and shall be governed by the laws of the State of Georgia.  The parties agree that the state and federal courts located in Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement.  Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship.  Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

**11. Employee's Status**

Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will".  No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

**12. Future Employment**

For so long as the restricted period in Section 2 of this Agreement remains in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement.  For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

**13  Prevailing Party**

If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

The parties hereto have duly executed this Agreement on the date identified below.

Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___12___ day of ___December___, 20__17__.
          (day)                (month)            (year)

MiMedx Group, Inc.

Stephen L. Blosser

By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration

___Employee Initial

Page 3 of 3

# EXHIBIT B

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1. Definitions.

   (a) "Business" means the business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and (v other current or future products developed, manufactured or marketed by the Company.

   (b) "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

   (c) "Material Contact" means the contact between Employee and each Customer or potential Customer of the Company: (i) with whom or with which Employee dealt on behalf of the Company in an effort to initiate, maintain or further a business relationship between the Company and the Customer or potential Customer; (ii) whose dealings with the Company were coordinated or supervised by Employee; (iii) about whom Employee obtained confidential information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within the last two (2) years of Employee's employment with the Company.

   (d) "Confidential Information" means (i) all non-public information in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems concerning the Company, its parent and the other subsidiaries of its parent relating to their respective businesses, operations, personnel, properties or finances which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time in connection with Employee's employment with the Company; (ii) all tangible reproductions or embodiments of the information described in (i); (iii) all notes, analyses, compilations, studies, interpretations or other documents, and all copies thereof, prepared by Employee, which contain, reflect or are based upon, in whole or in part, any of the information described in (i). Confidential Information includes, but is not limited to, data, reports (including, but not limited to, weekly task list reports and clinical research reports), analyses (including, but not limited to, analyses of competitive products and potentially competitive emerging technologies), matrices, notes, interpretations, protocols, forecasts, testing, methods and analysis of test results, records, models (including, but not limited to, the models of studies performed), documents, agreements, business plans, budgeting information, customer lists, the identity of and information relating to suppliers, business partnerships and acquisition targets, financial statements and other financial information of the Company and its customers or suppliers, know-how, strategic or technical data, research (primary and basic), clinical trial data and outcomes, technology (including without limitation all processing, manufacturing and related technology), designs, developments, inventions, data and any components thereof, whether or not copyrightable, intellectual property and trade secrets, whether or not patented or patentable, patent programs and strategies, sales and marketing data, marketing research data, marketing strategies, marketing materials (including, those in draft form), product information (including, but not limited to, the composition and structure of products, manufacturing processes for products, histology of products, biologic activity of products, internal opinions on the efficacy of products, and research team conclusions on products), product research and development data, sample product information, information discussed during lab meetings, software programs (including source code), pricing information and strategies, information provided by third parties which the Company has a duty to protect from disclosure.

The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to Employee being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (d) is explicitly approved for release by written authorization of the Company.

   (e) "Trade Secrets" means Confidential Information which meets the additional requirements of the Georgia Trade Secrets Act of 1990 (the "Act") or similar state law, as applicable, or the Defend Trade Secrets Act of 2016.

2. Employment.

(a) Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. While Employee is employed by the Company, Employee: (i) owes a duty of good faith and loyalty to the Company, (ii) shall devote Employee's full business time, energy and skill to the Business, and (iii) shall not: (A) become associated with or affiliated with any other business or entity which is the same as or essentially the same as the Business, (B) prepare or otherwise make arrangements to compete with the Business, and (C) sell other products, whether or not competitive, to customers who do or could purchase our products while employed.

(b) Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property, confidential information or trade secrets belonging to any prior or existing employer for use on behalf of Company, including, but not limited to, originals or copies of any contracts, agreements,

 Employee initial

financial books, records, client lists, memoranda, data, reports, programs, software, tapes, contact lists (including, but not limited to, those in Outlook or other electronic databases, including smartphones), letters, research, listings, programming or any other instruments, records or documents belonging to any former employer. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

(c) Prior to the end of his employment with all former employers, Employee did not solicit any clients or take any other action in violation of any former employer agreement or in violation of any other legal or contractual duty owed to any former employer, including any fiduciary duty or duty of loyalty to any former employer. For so long as Employee is an employee of Company, and bound by any term, provision or covenant of any former employer agreement, Employee will (i) abide by every term, provision and covenant of all such former employer agreements, (ii) take no action that would result in a breach of a representation or warranty under any former employer agreement, and (iii) take no action that would result in Company being liable to any former employer of Employee for any reason.

(d) Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will". No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

3.  **Duty of Confidentiality and Use Restrictions Relating to Confidential Information.**

(a) Employee shall (i) hold all Confidential Information in trust and confidence and not, directly or indirectly, divulge, publish or disclose the Confidential Information, whether it is tangible or intangible, to (A) any third party, or (B) any employee or contractor of the Company not authorized to access the Confidential Information, without prior written consent of the Company; (ii) not copy or remove from the Company offices any Confidential Information or Trade Secrets without prior written consent of the Company; and (iii) not use the Confidential Information for Employee's personal benefit or for the benefit of any third party, except as otherwise required pursuant to valid judicial order, provided Employee shall provide prompt written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee's obligations under this Section 3 as it relates to Confidential Information that is a trade secret under the Act shall apply as long as the Confidential Information remains a trade secret under the Act, and Employee's obligations under this Section 3 as it relates to Confidential Information that does not constitute trade secrets under the Act shall apply for three (3) years or as long as the Confidential Information remains confidential, whichever is shorter.

(b) Notwithstanding anything herein to the contrary, the term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (ii) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (iii) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (iv) is independently developed by Employee without the aid, application or use of the Confidential Information; or (v) is explicitly approved for release by written authorization of the Company.

(c) Notwithstanding Employee's obligations under this Section 3 not to disclose Confidential Information, nothing in this Agreement prohibits Employee from disclosing information in confidence to a government official or to an attorney for the sole purpose of reporting or investigating a suspected violation of the law. Similarly, nothing in this Agreement prohibits Employee from disclosing information in a complaint or other court filing, if and only if such filing is made under seal.

4.  **Company Property and Information.** Employee agrees and acknowledges that all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment, vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices are the sole and exclusive property and information of the Company and that the Company has not conveyed any ownership interest in any such items to Employee. Employee agrees to return all of the Company's property and information (i) within three (3) days following the end of Employee's employment with the Company for any reason, or (ii) immediately upon the Company's written request to Employee. To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5.  **Non-Solicitation Covenant.** While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business from any of the Customers or actively sought potential Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company, for purposes of providing any products or services competitive with those provided by the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment

 Employee initial

of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company.

6. **Non-Recruitment of Company Employees**   While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent for the purpose of encouraging, enticing, or causing the employee to terminate employment with the Company, or hire or engage the services of such employee, to provide products or services that are competitive with those provided by the Company.

7. **Reasonableness of Restrictions**   Employee agrees and acknowledges that the restraints imposed upon Employee under Sections 5 and 6: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business,

8. **Employee Acknowledgments**

   (a)   Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, (v) human allograft including skin and bone graft products, and (vi) other existing or future products developed, manufactured or marketed by the Company (the "Business").

   (b)   The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

   (c)   Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

9. **Choice of Law and Forum Selection.**  All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws.  Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County Georgia.  In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

10. **Construction of Agreement.**  The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement.  In the event a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

11. **Successors**  This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

12. **Entire Agreement and Modification.**  This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein.  The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

13. **Injunctive Relief.**  Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in or covering Cobb County Georgia enjoining said breach or threatened breach.  The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

14. **Prevailing Party**  If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

_____ **Employee initial**

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___29___ day of _____12_____, _2017_
            *(day)*           *(month)*    *(year)*

_____
Stephen L. Blocker

MiMedx Group, Inc.

_____
By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration

_____ Employee initial

Page 4 of 4

# Exhibit 6

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

**Christopher C. Marquardt**        Direct Dial: **+1 404 881 7827**        Email: **chris.marquardt@alston.com**

May 20, 2024

VIA UPS NEXT-DAY AIR DELIVERY & E-MAIL

Mr. Mark Diaz
President & Chief Commercial Officer
Surgenex, LLC
15444 N 76th Street, Suite 110
Scottsdale, AZ 85260
mark.diaz@surgenex.com

Re:      *Your Violations of Law With Respect to MiMedx*

Dear Mr. Diaz:

The law firm of Alston & Bird LLP represents MiMedx Group, Inc. ("MiMedx"). Our client has directed us to inform you that MiMedx will be asserting legal claims against you in the near future based on unfair competition and related claims.  If you are personally represented by legal counsel, please direct this letter to their attention.

Upon your receipt of this notice, you have a legal obligation to preserve any and all evidence that may be relevant to an imminent legal dispute with MiMedx, including any evidence contained on your personal cell phone and other personal devices. Wiping hard drives, destroying computer equipment, deleting text messages and direct messages, and doing anything else to prevent MiMedx from gaining access to Surgenex's written and electronic communications over the past many months may result in severe legal consequences and sanctions. That means, among other things, that **you must take immediate steps to permanently save** all email messages, text messages, instant messaging, social media posts, cell phone records, photos, electronic files, paper records, and any other documents and things that relate to: (1) your employment with and resignation from MiMedx; (2) your communications with representatives of Surgenex LLC ("Surgenex") about joining that firm; (3) your communications with current and former MiMedx employees regarding Surgenex and their departure from MiMedx, including messages sent via LinkedIn or via any other method or platform; (4) your communications with current and former MiMedx sales agents regarding Surgenex and their departure from MiMedx; (5) your employment at Surgenex; (6) your communications with MiMedx

Alston & Bird LLP                                                                                      www.alston.com

Atlanta  |  Beijing  |  Brussels  |  Charlotte  |  Dallas  |  Fort Worth  |  London  |  Los Angeles  |  New York  |  Raleigh  |  San Francisco  |  Silicon Valley  |  Washington, D.C.

Mr. Mark Diaz
May 20, 2024
Page 2

clients about your move from MiMedx to Surgenex, and/or their potential moves to Surgenex; and (7) any other related topics regarding Surgenex and MiMedx.

Without limiting your preservation duties, **you must take immediate steps to turn off any autodelete functions** on your phones or other electronic devices that might otherwise result in the destruction of relevant evidence. Any failure to take adequate steps to preserve relevant information (whether it is claimed to be "accidental," or not), and any destruction of information in your possession, will be met with requests for appropriate sanctions during any prosecution of MiMedx's claims against you.

MiMedx understands that you and Surgenex have conspired with persons who were then-employed by MiMedx to solicit and hire multiple MiMedx employees over the last several months (collectively, the "Former MiMedx Employees"). MiMedx also understands that you and Surgenex are aware that each of these employees has executed a Non-Competition Agreement and Confidentiality and Non-Solicitation Agreement with MiMedx (the "Agreements"). As an example, we enclose here a copy of the Agreements with Steve Blocker as Exhibits A and B to this letter.

In the Non-Competition Agreement, Mr. Blocker agreed that, within the restricted territory during his employment with MiMedx and for a one-year period following the end of his employment, he would not engage in the same or similar services or activities as those he performed at MiMedx. *See* Exh. A at ¶ 2. In the Confidentiality and Non-Solicitation Agreement Mr. Blocker agreed that, during his employment with MiMedx and for one year following the end of his employment, he would not solicit or attempt to solicit any business from MiMedx's customer or actively sought potential customers. *See* Exh. B at ¶ 5. He also agreed that, during his employment with MiMedx and for one year following the end of his employment, Mr. Blocker would not solicit or attempt to solicit any MiMedx employees for the purpose of "encouraging, enticing, or causing" the employees to terminate employment with MiMedx. *See* Exh. B at ¶ 6. In the Confidentiality and Non-Solicitation Agreement Mr. Blocker further agreed that he would not disclose MiMedx's Confidential Information or retain any of MiMedx's documents, data, or other material. *See* Exh. B at ¶¶ 3-4.

The Former MiMedx Employees' employment with Surgenex directly violates their Non-Competition Agreements. In addition, any attempt by the Former MiMedx Employees to recruit or encourage current MiMedx employees or customers to leave MiMedx for Surgenex, or any use of MiMedx's confidential, proprietary, or trade secret information other than during your work for MiMedx would constitute a direct violation of their Confidentiality and Non-Solicitation Agreements.

Separate and apart from their ongoing contractual obligations, each Former MiMedx Employee has owed common law duties of loyalty and fiduciary duties, as well as statutory duties under federal and state law. MiMedx therefore believes that the potential violations of law by you, Surgenex and the Former MiMedx Employee extend far beyond the language in the employment agreements that have been violated.

Mr. Mark Diaz
May 20, 2024
Page 3

MiMedx is aware that you and Surgenex have engaged in a months-long campaign to improperly lure away MiMedx's sales force and other employees and thereby gain access to MiMedx's confidential business information, trade secrets, clients and customers. MiMedx believes that you and Surgenex have taken actions that constitute business torts and that have aided and abetted the Former MiMedx Employees' breaches of duties and contractual obligations to MiMedx.

MiMedx's investigation into your actions has already begun, and our client is confident that the facts that have been discovered to date, combined with additional facts that will be obtained through formal discovery, will allow it to prevail on multiple claims against you, Surgenex and the Former MiMedx Employees.

Upon the commencement of a legal action, MiMedx will serve necessary subpoenas and legal papers to obtain relevant information regarding the Former MiMedx Employees' recent communications and activities leading up to their resignation from MiMedx and actions in concert with Surgenex. Our client is confident that the facts will establish violations of business tort laws and obligations under the Former MiMedx Employees' covenants agreements and other governing law.

This is a serious matter that should be taken very seriously. MiMedx hereby demands that you **cease and desist** from any and all actions that constitute unfair competition, misuse of confidential information, breaches of contractual duties, and interference with contract rights, and improper recruitment of MiMedx employees. Specifically, MiMedx demands that you provide assurances by **5:00 pm ET on Wednesday, May 22** of your receipt of this letter of any and all steps taken to ensure that the Former MiMedx Employees comply with and honor the post-employment restrictions set forth in their Agreements with MiMedx. MiMedx also demands the immediate return of any and all information about MiMedx's business and clients that are in the possession of Surgenex or on the electronic devices of the Former MiMedx Employees now employed by Surgenex.

Our client stands ready to pursue legal action as it deems necessary to defend its rights. If your counsel would like to discuss this matter in more detail, please have them contact me.

Mr. Mark Diaz
May 20, 2024
Page 4

Sincerely,

Christopher C. Marquardt

Enclosures

cc: William "Butch" Hulse (via email with enclosures)

# EXHIBIT A

# NON-COMPETITION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Employee Acknowledgments

(a)     The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and other existing or future products developed, manufactured, marketed, authorized, offered or provided by the Company (the "Business").

(b)     The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c)     Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

(d)     In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

## 2  Non-Competition

During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory (as such term is defined below in Section 2 of this Agreement), either directly or indirectly, (i) engage in, coordinate, supervise, or manage sales, marketing, customer service, account management, or sales support for any business offering products or services competitive with those offered by the Company; (ii) provide the same or similar services, engage in the same or similar activities, or manage the same or similar services as those provided or engaged in by Employee for or on behalf of the Company within two (2) years prior to the Termination Date for any business offering products or services competitive with those offered by the Company; or (iii) serve in a general management capacity or engage in general management activities for any business offering products or services competitive with those offered by the Business.

For purposes of this Agreement, "Territory" means any state in which Employee performs services on behalf of the Company and any U.S. state in which a customer to which Employee provides services on behalf of the Company is located at any time during Employee's relationship with the Company.  Employee agrees and acknowledges that as of the Effective Date, the Employee will be providing services on behalf of the Company in each of the U.S. states indicated below.  The Employee further agrees and acknowledges that from time to time during the course of Employee's employment with the Company, Employee may begin to provide services in other U.S. states not indicated below in which a customer to which Employee provides services on behalf of the Company after the Effective Date, is located ("Additional States").  Upon the Employee's Termination Date, the combination of the states indicated below plus such Additional States shall form the Territory in which this Agreement is enforced. Such Additional States and the states indicated below will be limited to those in which the above-described services were provided by the Employee on behalf of the Company within two (2) years prior to the Termination Date.


Employee Initial

| | | | |
|---|---|---|---|
| ☐ Alabama | ☒ Indiana | ☒ Nebraska | ☐ Rhode Island |
| ☐ Alaska | ☒ Iowa | ☐ Nevada | ☐ South Carolina |
| ☐ Arizona | ☒ Kansas | ☐ New Hampshire | ☒ South Dakota |
| ☐ Arkansas | ☐ Kentucky | ☐ New Jersey | ☐ Tennessee |
| ☐ California | ☐ Louisiana | ☐ New Mexico | ☐ Texas |
| ☐ Colorado | ☐ Maine | ☐ New York | ☐ Utah |
| ☐ Connecticut | ☐ Maryland | ☐ North Carolina | ☐ Vermont |
| ☐ Delaware | ☐ Massachusetts | ☒ North Dakota | ☐ Virginia |
| ☐ Florida | ☒ Michigan | ☒ Ohio | ☐ Washington |
| ☐ Georgia | ☒ Minnesota | ☐ Oklahoma | ☐ West Virginia |
| ☐ Hawaii | ☐ Mississippi | ☐ Oregon | ☒ Wisconsin |
| ☐ Idaho | ☒ Missouri | ☐ Pennsylvania | ☐ Wyoming |
| ☒ Illinois | ☐ Montana | | ☐ District of Columbia |

### 3. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

### 4. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

### 5 Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

### 6. Tolling

In the event the enforceability of any of the terms of this Agreement shall be challenged in a court of competent jurisdiction and Employee is not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the lawsuit challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

### 7. Reasonableness of Restrictions

Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

### 8 Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.


_____ Employee Initial

**9  Entire Agreement and Modification**

This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

**10  Governing Law; Jurisdiction; Venue**

This Agreement has been entered into under and shall be governed by the laws of the State of Georgia. The parties agree that the state and federal courts located in Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement. Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship. Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

**11. Employee's Status**

Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will". No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

**12. Future Employment**

For so long as the restricted period in Section 2 of this Agreement remains in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement. For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

**13  Prevailing Party**

If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

The parties hereto have duly executed this Agreement on the date identified below.

Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___12___ day of ___December___, 20_17_.
     (day)          (month)      (year)

MiMedx Group, Inc.

Stephen L. Blosser

By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration

_____ Employee Initial

Page 3 of 3

# EXHIBIT B

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Stephen L. Blocker ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1.  Definitions.

    (a) "Business" means the business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, and (v other current or future products developed, manufactured or marketed by the Company.

    (b) "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

    (c) "Material Contact" means the contact between Employee and each Customer or potential Customer of the Company: (i) with whom or with which Employee dealt on behalf of the Company in an effort to initiate, maintain or further a business relationship between the Company and the Customer or potential Customer; (ii) whose dealings with the Company were coordinated or supervised by Employee; (iii) about whom Employee obtained confidential information in the ordinary course of business as a result of Employee's association with the Company; or (iv) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for Employee within the last two (2) years of Employee's employment with the Company.

    (d) "Confidential Information" means (i) all non-public information in any form or media, whether oral, written, graphic, machine readable, sample form, or other tangible media, or in information storage and retrieval systems concerning the Company, its parent and the other subsidiaries of its parent relating to their respective businesses, operations, personnel, properties or finances which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time in connection with Employee's employment with the Company; (ii) all tangible reproductions or embodiments of the information described in (i); (iii) all notes, analyses, compilations, studies, interpretations or other documents, and all copies thereof, prepared by Employee, which contain, reflect or are based upon, in whole or in part, any of the information described in (i). Confidential Information includes, but is not limited to, data, reports (including, but not limited to, weekly task list reports and clinical research reports), analyses (including, but not limited to, analyses of competitive products and potentially competitive emerging technologies), matrices, notes, interpretations, protocols, forecasts, testing, methods and analysis of test results, records, models (including, but not limited to, the models of studies performed), documents, agreements, business plans, budgeting information, customer lists, the identity of and information relating to suppliers, business partnerships and acquisition targets, financial statements and other financial information of the Company and its customers or suppliers, know-how, strategic or technical data, research (primary and basic), clinical trial data and outcomes, technology (including without limitation all processing, manufacturing and related technology), designs, developments, inventions, data and any components thereof, whether or not copyrightable, intellectual property and trade secrets, whether or not patented or patentable, patent programs and strategies, sales and marketing data, marketing research data, marketing strategies, marketing materials (including, those in draft form), product information (including, but not limited to, the composition and structure of products, manufacturing processes for products, histology of products, biologic activity of products, internal opinions on the efficacy of products, and research team conclusions on products), product research and development data, sample product information, information discussed during lab meetings, software programs (including source code), pricing information and strategies, information provided by third parties which the Company has a duty to protect from disclosure.

    The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to Employee being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (d) is explicitly approved for release by written authorization of the Company.

    (e) "Trade Secrets" means Confidential Information which meets the additional requirements of the Georgia Trade Secrets Act of 1990 (the "Act") or similar state law, as applicable, or the Defend Trade Secrets Act of 2016.

2.  Employment.

    (a) Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. While Employee is employed by the Company, Employee: (i) owes a duty of good faith and loyalty to the Company, (ii) shall devote Employee's full business time, energy and skill to the Business, and (iii) shall not: (A) become associated with or affiliated with any other business or entity which is the same as or essentially the same as the Business, (B) prepare or otherwise make arrangements to compete with the Business, and (C) sell other products, whether or not competitive, to customers who do or could purchase our products while employed.

    (b) Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property, confidential information or trade secrets belonging to any prior or existing employer for use on behalf of Company, including, but not limited to, originals or copies of any contracts, agreements,

 Employee initial

financial books, records, client lists, memoranda, data, reports, programs, software, tapes, contact lists (including, but not limited to, those in Outlook or other electronic databases, including smartphones), letters, research, listings, programming or any other instruments, records or documents belonging to any former employer. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

(c) Prior to the end of his employment with all former employers, Employee did not solicit any clients or take any other action in violation of any former employer agreement or in violation of any other legal or contractual duty owed to any former employer, including any fiduciary duty or duty of loyalty to any former employer. For so long as Employee is an employee of Company, and bound by any term, provision or covenant of any former employer agreement, Employee will (i) abide by every term, provision and covenant of all such former employer agreements, (ii) take no action that would result in a breach of a representation or warranty under any former employer agreement, and (iii) take no action that would result in Company being liable to any former employer of Employee for any reason.

(d) Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will". No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

3.  Duty of Confidentiality and Use Restrictions Relating to Confidential Information.

(a) Employee shall (i) hold all Confidential Information in trust and confidence and not, directly or indirectly, divulge, publish or disclose the Confidential Information, whether it is tangible or intangible, to (A) any third party, or (B) any employee or contractor of the Company not authorized to access the Confidential Information, without prior written consent of the Company; (ii) not copy or remove from the Company offices any Confidential Information or Trade Secrets without prior written consent of the Company; and (iii) not use the Confidential Information for Employee's personal benefit or for the benefit of any third party, except as otherwise required pursuant to valid judicial order, provided Employee shall provide prompt written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee's obligations under this Section 3 as it relates to Confidential Information that is a trade secret under the Act shall apply as long as the Confidential Information remains a trade secret under the Act, and Employee's obligations under this Section 3 as it relates to Confidential Information that does not constitute trade secrets under the Act shall apply for three (3) years or as long as the Confidential Information remains confidential, whichever is shorter.

(b) Notwithstanding anything herein to the contrary, the term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (ii) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (iii) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; or (iv) is independently developed by Employee without the aid, application or use of the Confidential Information; or (v) is explicitly approved for release by written authorization of the Company.

(c) Notwithstanding Employee's obligations under this Section 3 not to disclose Confidential Information, nothing in this Agreement prohibits Employee from disclosing information in confidence to a government official or to an attorney for the sole purpose of reporting or investigating a suspected violation of the law. Similarly, nothing in this Agreement prohibits Employee from disclosing information in a complaint or other court filing, if and only if such filing is made under seal.

4.  Company Property and Information. Employee agrees and acknowledges that all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices are the sole and exclusive property and information of the Company and that the Company has not conveyed any ownership interest in any such items to Employee. Employee agrees to return all of the Company's property and information (i) within three (3) days following the end of Employee's employment with the Company for any reason, or (ii) immediately upon the Company's written request to Employee. To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5.  Non-Solicitation Covenant. While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any business from any of the Customers or actively sought potential Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company, for purposes of providing any products or services competitive with those provided by the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment

 Employee Initial

Page 2 of 4

of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company.

6.  **Non-Recruitment of Company Employees**   While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent for the purpose of encouraging, enticing, or causing the employee to terminate employment with the Company, or hire or engage the services of such employee, to provide products or services that are competitive with those provided by the Company.

7.  **Reasonableness of Restrictions**   Employee agrees and acknowledges that the restraints imposed upon Employee under Sections 5 and 6: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business,

8.  **Employee Acknowledgments**

    (a)   Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, processor and/or marketer of (i) collagen based biomaterials and products, (ii) bioimplants processed from human amniotic membrane, (iii) other amnion-based products, (iv) tissue regeneration products, (v) human allograft including skin and bone graft products, and (vi) other existing or future products developed, manufactured or marketed by the Company (the "Business").
    (b)   The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990, or similar state law, or the Defend Trade Secrets Act of 2016); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.
    (c)   Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

9.  **Choice of Law and Forum Selection.**   All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County Georgia. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

10. **Construction of Agreement.**   The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement. In the event a court should determine not to enforce a covenant as written due to overbreadth, whether due to too great a period of time, too large a territory, or too broad a scope of prohibited activities, the covenant shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

11. **Successors**   This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

12. **Entire Agreement and Modification.**   This Agreement represents the entire understanding between Employee and the Company on a matter addressed herein and may not be modified, changed or altered by any promise or statement of any other employee of the Company other than in a writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

13. **Injunctive Relief.**   Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in or covering Cobb County Georgia enjoining said breach or threatened breach. The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

14. **Prevailing Party**   If the Company is the prevailing party in any proceeding or action at law or in equity brought by the Company to enforce or interpret the terms of this Agreement, Employee shall reimburse the Company for the costs (including reasonable attorney's fees and expert fees) incurred by the Company in such proceeding.

_____ Employee initial

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement.  Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___29___ day of ___12___, ___2017___
          *(day)*                   *(month)*       *(year)*

MiMedx Group, Inc.

_____
Stephen L. Blocker

By: Thornton A. Kuntz, Jr.
    Senior Vice President, Administration

_____ Employee Initial

Page 4 of 4

ID# 2024-0071787-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**24103933**

D. Victor Reynolds - 69
MAY 24, 2024 04:50 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER   24103933

$214.00 COST PAID

MiMedx Group, Inc
_____

**PLAINTIFF**

**VS.**

Surgenex, LLC
Diaz, Mark Mr.
Blocker, Stephen
_____

**DEFENDANTS**

**SUMMONS**

TO: SURGENEX, LLC

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Christopher Marquardt**
> **Alston & Bird LLP**
> **1201 West Peachtree Street**
> **Atlanta, Georgia 30309-3424**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 24th day of May, 2024.**

Clerk of Superior Court

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

ID# 2024-0071788-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**24103933**

**D. Victor Reynolds - 69**
**MAY 24, 2024 04:50 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER   24103933

$214.00 COST PAID

MiMedx Group, Inc
_____

**PLAINTIFF**

                                        **VS.**

Surgenex, LLC
Diaz, Mark Mr.
Blocker, Stephen
_____

**DEFENDANTS**

**SUMMONS**

TO: DIAZ, MARK MR.

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Christopher Marquardt**
**Alston & Bird LLP**
**1201 West Peachtree Street**
**Atlanta, Georgia 30309-3424**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 24th day of May, 2024.**

                              Clerk of Superior Court

                              Connie Taylor, Clerk of Superior Court
                              Cobb County, Georgia

ID# 2024-0071789-CV
☒ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**24103933**

D. Victor Reynolds - 69
MAY 24, 2024 04:50 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER   24103933

$214.00 COST PAID

MiMedx Group, Inc
_____

**PLAINTIFF**                                                  **VS.**

Surgenex, LLC
Diaz, Mark Mr.
Blocker, Stephen
_____

**DEFENDANTS**

## SUMMONS

TO: BLOCKER, STEPHEN

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Christopher Marquardt**
**Alston & Bird LLP**
**1201 West Peachtree Street**
**Atlanta, Georgia 30309-3424**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 24th day of May, 2024.**

Clerk of Superior Court

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

24-2024-0071790-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

24103933

D. Victor Reynolds - 69
MAY 24, 2024 04:50 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

**General Civil and Domestic Relations Case Filing Information Form**

☑ **Superior** or ☐ **State Court of** Cobb     **County**

| **For Clerk Use Only** | |
|---|---|
| **Date Filed** 05-24-2024 | **Case Number** 24103933 |
| **MM-DD-YYYY** | |

**Plaintiff(s)**

MiMedx Group, Inc

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

Surgenex, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Diaz, Mark Mr. | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Blocker, Stephen | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** Marquardt, Christopher    **Bar Number** 471150    **Self-Represented** ☐

### Check one case type and, if applicable, one sub-type in one box.

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☑ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____  _____
**Case Number**  **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

ID#2024-0071791-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**24103933**

D. Victor Reynolds - 69
MAY 24, 2024 04:50 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

# DISCLOSURE STATEMENT
## CLERK OF SUPERIOR COURT

CASE NUMBER   __24103933__

**MiMedx Group, Inc;**
                         Plaintiff

                     Vs.

**Surgenex, LLC; Diaz, Mark Mr.; Blocker, Stephen**
                   Defendant

### TYPE OF ACTION

- ○ Divorce without Agreement Attached
- ○ Divorce with Agreement Attached
- ○ Domestic Relations
- ☑ Damages Arising out of Contract
- ○ Damages Arising out of Tort
- ○ Condemnation
- ○ Equity
- ○ Zoning – County Ordinance Violations (i.e., Injunctive Relief-Zoning)
- ○ Zoning Appeals (denovo)
- ○ Appeal, Including denovo appeal – excluding Zoning

- ○ URESA
- ○ Name Change
- ○ Other
- ○ Recusal
- ○ Adoption

### PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court (Whether pending simultaneously or not)?

- ☑   NO
- ○   YES – If yes, please fill out the following:

        1. Case # _____

        2. Parties _____

        3. Assigned Judge _____

        4. Is this case still pending?        ○   Yes        ○   No

        5. Brief description of similarities:

/S/   **Marquardt, Christopher**

Attorney or Party Filing Suit